**WINSTAR CORPORATION, United Federal Savings Bank, Statesman Savings Holding Corp., The Statesman Group, Inc. and American Life and Casualty Insurance Company,**

and

**Glendale Federal Bank, FSB, Plaintiffs–Appellees,**

v.

**The UNITED STATES, Defendant–Appellant.**

**No. 92–5164.**

United States Court of Appeals, Federal Circuit.

Aug. 30, 1995.

Charles J. Cooper, Shaw, Pittman, Potts & Trowbridge, Washington, DC, argued, for plaintiffs-appellees, Winstar Corp., United Federal Sav. Bank, Statesman Sav. Holding Corp., The Statesman Group, Inc., and American Life and Cas. Ins. Co. With him on the brief were Michael A. Carvin, Robert J. Cynkar and Vincent J. Colatriano. Jerry Stouck, Spriggs & Hollingsworth, Washington, DC, argued, for plaintiffs-appellees, Glendale Federal Bank, FSB. With him on the brief were Joe G. Hollingsworth, Donald W. Fowler and Charles J. Fromm.

Douglas Letter, Appellate Litigation Counsel, Dept. of Justice, Washington, DC, argued, for defendant-appellant, U.S. With him on the brief was Frank W. Hunger, Asst. Atty. Gen., Scott R. McIntosh and William Kanter, Attys., Dept. of Justice, Washington, DC, for defendant-appellant, U.S.

William H. Butterfield, McGuire, Woods, Battle & Boothe, Washington, DC, was on the brief for, amicus curiae, The Electronic Industries Ass'n, The Shipbuilders Council of America, Inc. and Litton Industries, Inc.

Clarence T. Kipps, Jr. and Kevin C. Dwyer, Miller & Chevalier, Chartered, Washington, DC, were on the brief, for the amicus curiae, Aerospace Indust. Ass'n of America, Inc. Also on the brief were Professor Emeritus John Cibinic, Jr., The National Law Center, Washington, DC, Kathleen A. Buck, Kirkland & Ellis, Washington, DC, and Mac S. Dunaway and Gary E. Cross, Dunaway & Cross, Washington, DC.

Herbert L. Fenster, McKenna & Cuneo, Washington, DC, was on the brief, for amicus curiae, Chamber of Commerce of U.S. With him on the brief were Tami Lyn Azorsky and Margaret C. Rhodes. Also on the brief was Robin S. Conrad, National Chamber Litigation Center, Inc., Washington, DC, of counsel were Hugo Teufel, III and Mark A. Rowland.

Don S. Willner, Willner & Zabinsky, Portland, OR, was on the brief, for amicus curiae, C. Robert Suess, Leo Sherry, Richard A. Green, Irving Roberts and Foster, Paulsell &

Baker, Inc. With him on the brief were Thomas M. Buchanan and Eric W. Bloom, Winston & Strawn, Washington, DC.

Melvin C. Garbow and Peter T. Grossi, Jr., Arnold & Porter, Washington, DC, were on the brief, for amicus curiae, Amwest Sav. Ass'n and The Adam Corp./Group; The Globe Sav. Bank, FSB and Phoenix Capital Group, Inc.; and Old Stone Corp. Of counsel were Peter M. Barnett, Linda B. Coe and Matthew Frumin.

Billie J. Ellis, Jr., Kelly, Hart & Hallman, Fort Worth, TX, was on the brief, for amicus curiae, Keystone Holdings, Inc. and American Sav. Bank, F.A.

Daniel J. Goldberg, Housley, Goldberg & Kantarian, P.C., Washington, DC, was on the brief, for amicus curiae, Coast Federal Bank, Union Federal Sav. Bank of Indianapolis, Union Federal Sav. Bank of Frankton and Union Holding Co., Inc.

John C. Millian, Gibson, Dunn & Crutcher, Washington, DC, was on the brief for Trinity Ventures, Ltd. and Castle Harlan, Inc. With him on the brief were Wesley G. Howell, Jr., Gibson, Dunn & Crutcher, New York City and John K. Bush, Gibson, Dunn & Crutcher, Washington, DC.

Paul Blankenstein and John K. Bush, Gibson, Dunn & Crutcher, Washington, DC, were on the brief, for amicus curiae, Dollar Bank, F.S.B.

Laurence H. Tribe, Cambridge, MA, was on the brief for, amicus curiae, AmBase Corp. and carteret Bancorp, Inc. With him on the brief was Brian Stuart Koukoutchos, Bedford, MA, Harvey Silverglate and Andrew Good, Silverglate & Good, Boston, MA, Wesley G. Howell, Jr., Gibson, Dunn & Crutcher, New York City and John C. Millian, Gibson, Dunn & Crutcher, Washington, DC.

Thomas M. Buchanan and Eric W. Bloom, Winston & Strawn, Washington, DC, were on the brief, for amicus curiae, Franklin Financial Group, Inc., Franklin Federal Sav. Bank, and Charter Federal Sav. Bank.

Lloyd N. Cutler, Wilmer, Cutler & Pickering, Washington, DC, was on the brief, for

amicus curiae, The Long Island Sav. Bank, FSB and The Long Island Sav. Bank of Centerach FSB. With him on the brief were William B. Richardson, Jr., Michael S. Helfer and Lydia R. Pulley. Also on the brief were Michael J. Chepiga and Eric S. Kobrick, Simpson, Thacher & Bartlett, New York City. Russell E. Brooks, Milbank, Tweed, Hadley & McCloy, New York City, for amicus curiae, The Long Island Sav. Bank, FSB.

Timothy K. Irvine, Gen. Counsel, Franklin Federal Bancorp, Austin, TX, was on the brief, for amicus curiae, Franklin Federal Bancorp.

Before ARCHER, *Chief Judge,*\* and RICH, NIES, NEWMAN, MAYER, MICHEL, PLAGER, LOURIE, CLEVENGER, RADER, and SCHALL, *Circuit Judges.*\*\*

Opinion for the court filed by Chief Judge ARCHER, in which Circuit Judges RICH, NEWMAN, MAYER, MICHEL, PLAGER, CLEVENGER, RADER, and SCHALL join. Dissenting opinions filed by Circuit Judges NIES, and LOURIE.

ARCHER, Chief Judge.

The United States appeals the decisions[1] of the United States Court of Federal Claims[2] granting plaintiffs Winstar Corporation and United Federal Savings Bank, No. 90–8C, plaintiffs Statesman Savings Holding Corporation, the Statesman Group Incorporated and American Life and Casualty Company, No. 90–773C, and plaintiff Glendale Federal Bank, No. 90–772C, summary judgment on the liability portion of their breach of contract claims against the United States. The cases were consolidated for purposes of this interlocutory appeal. We affirm.

## I

In its *Winstar* decisions, the Court of Federal Claims found that an implied-in-fact contract existed between the government and Winstar and that the government breached this contract when Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101–73, 103 Stat. 183 (codified in relevant part at 12 U.S.C. § 1464). Similarly, in the *Statesman* decision the Court of Federal Claims found that plaintiffs Statesman Savings Holding Corporation, the Statesman Group Incorporated and the American Life and Casualty Insurance Company (together "Statesman") and plaintiff Glendale Federal Bank ("Glendale") had express contracts with the government and citing its *Winstar* decision, found that these contracts were breached by the enactment of FIRREA.

The Court of Federal Claims certified its decisions in these three related cases for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) after determining that the decisions involved controlling questions of law as to which there is substantial ground for difference of opinion and that an immediate appeal may materially advance the termination of these and other related cases. We granted the appeal. 979 F.2d 216 (Fed.Cir. 1992). After an initial split panel decision of this Court reversed the Court of Federal Claims, 994 F.2d 797 (Fed.Cir.1993), we vacated the panel opinion and agreed with the plaintiffs' suggestion to consider these cases in banc.

## II

A. During the Great Depression of the 1930s, 40 percent of the nation's $20 billion in home mortgages went into default, 1700 of

---

\* Chief Judge Archer assumed the position of Chief Judge on March 18, 1994.

\*\* Circuit Judge Bryson joined the Federal Circuit on October 7, 1994, and has not participated in the disposition of this appeal.

1. *Winstar Corp. v. United States,* 21 Cl.Ct. 112 (1990) (finding an implied-in-fact contract but requesting further briefing on contract issues) (*Winstar I*); 25 Cl.Ct. 541 (1992) (finding contract breached and entering summary judgment on liability) (*Winstar II*); *Statesman Savings*

*Holding Corp. v. United States,* 26 Cl.Ct. 904 (1992) (granting summary judgment on liability to Statesman and Glendale).

2. The Federal Courts Administration Act of 1992, Pub.L. No. 102–572, § 902(a), 106 Stat. 4506, 4516, changed the name of the former United States Claims Court to the "United States Court of Federal Claims." Except where the context requires otherwise, we refer to the trial court by its new name.

the approximately 12,000 thrift institutions failed, and depositors in these thrifts lost $200 million. H.R.Rep. No. 54(I), 101st Cong., 1st Sess. 292 (1989), *reprinted in* 1989 U.S.C.C.A.N. 86, 88–89 (House Report). Congress took several measures in response. First, Congress created the Federal Home Loan Bank Board (Bank Board) to channel funds to thrifts in order to prevent foreclosures and to allow thrifts to make loans on residences. House Report at 292, 1989 U.S.C.C.A.N. at 88; *see* Federal Home Loan Bank Act, Pub.L. No. 72–304, 47 Stat. 725 (1932) (codified as amended at 12 U.S.C. §§ 1421–1449 (1988)). Next, Congress added the Home Owners' Loan Act, which authorized the Bank Board to charter and regulate federal savings and loan associations. Pub.L. No. 73–43, 48 Stat. 128 (1933) (codified as amended at 12 U.S.C. §§ 1461–1468 (1988)). Then, to further restore public confidence in thrift institutions, Congress in the National Housing Act of 1934 provided federal deposit insurance for depositors. Pub.L. No. 73–479, 48 Stat. 1246 (1934) (codified as amended at 12 U.S.C. §§ 1701–1750g (1988)). This act also established the Federal Savings and Loan Insurance Corporation (FSLIC), an agency under the Bank Board's authority that regulated all federally insured thrifts.

Among the regulatory requirements promulgated and enforced by the agencies were capital requirements, which were minimum reserves of capital that a thrift had to maintain. Failure to comply with minimum regulatory capital requirements had severe repercussions for a thrift. The agencies had a variety of measures that could be taken against noncomplying thrifts. In the most serious cases, the government could seize the thrift and place it into receivership where it might later be sold or liquidated. This drastic remedy was rarely necessary, however, because of the relative health of the thrift industry until the thrift crisis of the late 1970s and early 1980s.

In the late 1970s and early 1980s high interest rates resulted in sharply higher costs of funds for thrifts. The thrifts' main assets were long-term, fixed-rate mortgages taken during times of lower interest rates. As a result, the revenues produced by these mortgages were exceeded by the rapidly rising costs of attracting short-term deposits. Thrifts that were locked into long-term low interest rate loans simply could not meet their deposit obligations. This interest rate mismatch was one of the principal causes of numerous thrift failures. Eighty-one thrifts failed in 1981, 252 in 1982, and 102 in 1983. House Report at 296, 1989 U.S.C.C.A.N. at 92.

With all of these bank failures and the likelihood of more occurring, the FSLIC faced deposit insurance liabilities that threatened to exhaust its insurance fund. *See Olympic Fed. Sav. & Loan Ass'n v. Director, OTS,* 732 F.Supp. 1183, 1185 (D.D.C.1990). As an alternative to liquidating failing thrifts and expending the FSLIC's insurance funds, the Bank Board and FSLIC encouraged healthy thrifts to merge with the failing ones. In these supervisory mergers, the regulators provided direct assistance and other incentives necessary for the healthy thrifts to maintain their financial well-being after the mergers and in this way the regulators tried to avoid paying off the failing thrifts' deposits out of the FSLIC's insurance fund. Among the incentives offered by the FSLIC and the Bank Board was the use of the purchase method of accounting under which "supervisory goodwill" resulting from the merger would be treated as satisfying part of the merged thrift's regulatory capital requirements. *See* Bank Board Memorandum R–31b (1981). Another incentive was the use of "capital credits" that also could be counted toward the regulatory capital requirements.

The purchase method of accounting is a generally accepted accounting practice (GAAP) for mergers, which accounts for the surplus of the purchase price over the fair market value of the acquired organization as goodwill, an intangible asset. As explained by the Court of Federal Claims:

> Under [the purchase method of accounting,] ... the book value of the acquired thrift's assets and liabilities was adjusted to fair market value at the time of the acquisition. Any excess in the cost of the acquisition (which included liabilities assumed by the acquirer) over the fair market value of the acquired assets was sepa-

rately recorded on the acquirer's books as "goodwill." ... Goodwill was considered an intangible asset that could be amortized on a straightline basis over a number of years.

*Winstar I,* 21 Cl.Ct. at 113. In the context of a supervisory merger, the difference between the fair market value of the failing thrift's liabilities assumed by an acquirer and the fair market value of the failing thrift's assets was considered "supervisory goodwill." The Bank Board and the FSLIC allowed the merged thrifts to count this supervisory goodwill toward the minimum regulatory capital requirements and to amortize this goodwill over periods of up to 40 years. This permitted the healthy thrift to assume the deposit liabilities of the failing thrift and to maintain capital compliance without having to put up large amounts of its own money and without requiring large amounts of monetary assistance from the government.

The capital credits incentive used by the Bank Board and the FSLIC to encourage mergers with failing thrifts involved the FSLIC's contribution of cash to the merged thrifts. The regulators allowed a portion or all of this cash contribution to be treated as partial satisfaction of the merged thrift's regulatory capital requirements. In addition, this cash contribution in some instances would not be treated as an asset in determining supervisory goodwill generated by the merger.

Allowing acquirers of failing thrifts to treat supervisory goodwill and capital credits as regulatory capital stimulated many acquisitions that would otherwise not have taken place because of the difficulty of meeting the minimum capital requirements. Indeed this was the precise intention of the Bank Board and FSLIC—supervisory mergers could not have occurred without the approval by the regulatory agencies of these accounting treatments. As former Bank Board Chairman Richard Pratt stated in testimony before Congress:

The Bank Board was caught between a rock and a hard place. While it did not have sufficient resources to close all insolvent institutions, at the same time, it had to consolidate the industry, move weaker institutions into stronger hands and do everything possible to minimize losses during the transition period. Goodwill was an indispensable tool in performing this task. The GAAP approach to purchase method accounting mergers provided a bridge which allowed the Bank Board to encourage the necessary consolidation of the industry, while at the same time husbanding the financial resources which were then available to it.

*Savings and Loan Policies in the Late 1970s and 1980s: Hearings Before the House Comm. on Banking, Finance and Urban Affairs,* 101st Cong., 2d Sess., No. 176, at 227 (1990).

B. Winstar, Statesman and Glendale acquired insolvent, failing thrifts under this policy of encouraging thrift mergers. In each case, they received the government's approval and assistance. In each case, the government saved millions of dollars that it would have had to pay to the insured depositors if the failing thrifts had been liquidated instead of being acquired.

1. In September of 1981, Glendale Federal Bank was approached by First Federal Savings and Loan Association of Broward County (Broward) about a possible merger. Glendale was a federal savings and loan association based in California. It was a profitable thrift, which was in full regulatory compliance. Broward was a federal savings and loan association based in Florida that had incurred significant losses. Broward's liabilities exceeded its assets by approximately $734 million. Glendale submitted a merger proposal to the FSLIC. Glendale proposed to use the purchase method of accounting to record the supervisory goodwill resulting from this accounting as an intangible asset amortizable over periods up to 40 years. After lengthy negotiations over the terms and conditions, the FSLIC agreed to provide assistance to the merged entity and to recommend approval of the merger transaction to the Bank Board.

In its resolution approving the merger plan between Glendale and Broward, the Bank Board imposed the condition that Glendale provide an opinion letter satisfactory to the Board's supervisory agent from its inde-

pendent accountants justifying the use of the purchase method of accounting, specifically describing any goodwill arising from the merger, and substantiating the reasonableness of the amounts attributable to goodwill and the resulting amortization periods and methods. The Bank Board resolution also gave the FSLIC authority to enter into a Supervisory Action Agreement (SAA) with Glendale. The SAA with Glendale was signed in November of 1981 and Glendale promptly consummated its merger with Broward. As required by the Bank Board resolution, Glendale later provided its accountants' justification and opinion letter satisfactory to the Bank Board, which stated that "$18,000,000 of the resultant goodwill . . . will be amortized on a straight line basis over 12 years" and that the "remaining goodwill of $716,666,000 will be amortized on a straight line basis over 40 years." By the government's estimates, the Glendale–Broward merger saved the government approximately three quarters of a billion dollars.

2. In 1987 Statesman approached the FSLIC about acquiring a subsidiary of an insolvent state-chartered FSLIC insured savings and loan in Florida, First Federated Savings Bank (First Federated). The FSLIC responded to the inquiry by indicating that Statesman would have to acquire all of First Federated if the government was to assist. Further, it would require that Statesman's acquisition of First Federated be combined with the acquisition of three other financially troubled thrifts in Iowa.[3] After a year of negotiating the FSLIC and Statesman agreed on the terms of a complex plan whereby Statesman would acquire the four thrifts.

Like the merger of Glendale, Statesman's merger plan called for the use of the purchase method of accounting. The Statesman plan called for an investment by Statesman and its co-investor American Life and Casualty Company of $21 million into Statesman's Savings Holding Company, which in turn would purchase $21 million of stock in a newly-formed federal stock savings bank

named Statesman Bank for Savings. The Statesman Bank for Savings would then merge with the four failing thrifts.

As part of the transactions, the FSLIC and Statesman entered into an Assistance Agreement calling for the FSLIC to provide a $60 million cash contribution to the Statesman Bank for Savings. Under the Assistance Agreement and the Bank Board Resolution approving the merger, $26 million of this cash contribution (including $5 million represented by a debenture that Statesman was required to pay back) was to be permanently credited to Statesman's regulatory capital (i.e., as a capital credit) for purposes of meeting minimum regulatory capital requirements. Statesman's merger is the only one of the three at issue in this appeal that involves a capital credit.

The Bank Board resolution permitted use of the purchase method of accounting. Supervisory goodwill arising from the merger acquisitions in the amount of $25.8 million was recognized as a capital asset for purposes of meeting regulatory capital requirements and Statesman was allowed to amortize that goodwill over 25 years. The Bank Board granted authority to the FSLIC to enter into the Assistance Agreement with Statesman and required Statesman to provide an opinion letter from its independent accountants to justify its use of the purchase method of accounting and supervisory goodwill. Statesman provided the opinion letter to the agency's satisfaction. By the government's estimates, the cost of the Statesman merger to the government was $50 million less than the cost of liquidating the four thrifts.

3. In 1983 a Minnesota-based thrift, Windom Federal Savings and Loan Association (Windom), was in danger of failing. The board of directors of Windom determined that its failure could not be avoided without assistance from the FSLIC. The FSLIC estimated that liquidating the federally insured thrift could cost $12 million dollars and it pursued an alternative to paying this mon-

---

**3.** The three thrifts were First Federal Savings Bank of Waterloo, Iowa, Peoples Federal Savings and Loan Association of Waterloo, Iowa, and Perpetual Savings and Loan Association of Waterloo, Iowa.

ey out of its insurance fund. It chose to solicit bids for the acquisition of Windom.

Winstar Corporation was a holding company formed by investors for the purpose of acquiring Windom. Winstar in turn formed a new wholly-owned, federal stock savings bank, United Federal Savings Bank, to merge with Windom. Winstar's plan contemplated financing the merger by cash contributions by both the investors and the FSLIC. The plan also called for use of the purchase method of accounting and recording supervisory goodwill as an intangible asset which initially was to amortized over a period of 40 years (later changed to 35 years). After negotiating the terms with Winstar Corporation and its investors, the FSLIC recommended to the Bank Board that it approve the merger plan. The Bank Board approved the merger again subject to Winstar providing an opinion letter from its independent accountants justifying the use of the purchase method of accounting and detailing the resulting supervisory goodwill. As a part of the transaction, FSLIC signed an Assistance Agreement with Winstar Corporation and the Bank Board issued a forbearance letter. The forbearance letter stated that intangible assets resulting from use of the purchase method of accounting "may be amortized . . . over a period not to exceed 35 years by the straight-line method." By the government's estimates, the Winstar–Windom merger saved the government $7 million over what liquidation of Windom would have cost.

C. In spite of these and similar actions taken by the Bank Board and the FSLIC, thrifts continued to fail and the public confidence in the thrift industry continued to erode during the late 1980s. In response to this crisis in the savings and loan industry, Congress in 1989 passed FIRREA. FIRREA substantially modified the overall thrift regulatory scheme. As pertinent here, it (1) abolished the FSLIC and transferred its functions to other agencies; (2) created a new thrift deposit insurance fund under the Federal Deposit Insurance Corporation (FDIC); (3) eliminated the Bank Board and replaced it with the Office of Thrift Supervision (OTS), an office within the Department of Treasury, and made the OTS Director

responsible for the regulation of all federally insured savings associations and the chartering of federal thrifts; and (4) established the Resolution Trust Corporation (RTC), which was charged with closing certain thrifts. *See* 12 U.S.C. §§ 1437 note, 1441a, 1821.

Among the legislative reforms of FIRREA was the requirement that the OTS "prescribe and maintain uniformly applicable capital standards for savings associations." 12 U.S.C. § 1464(t)(1)(a). In addition, Congress expressly restricted the continued use of supervisory goodwill to satisfy regulatory capital requirements.

FIRREA required federally insured thrifts to satisfy three new minimum capital standards: "tangible" capital, "core" capital, and "risk-based" capital. 12 U.S.C. § 1464(t). Under FIRREA supervisory goodwill could not be included at all in satisfying minimum tangible capital. The amount of supervisory goodwill that could be included in satisfying "core" capital decreased each year after FIRREA's enactment and was entirely phased out on December 31, 1994. Finally, thrifts were required to maintain "risk-based" capital in an amount substantially comparable to that required by the Comptroller of the Currency for national banks. 12 U.S.C. § 1464(t)(2)(C). Although supervisory goodwill could be used for this purpose, FIRREA limited its amortization to a period of no more than 20 years. 12 U.S.C. § 1464(t)(9)(B).

FIRREA did not specifically cover capital credits or otherwise exclude FSLIC cash contributions from capital for purposes of determining compliance with any of the minimum capital requirements. The OTS, however, equated capital credits with "qualifying supervisory goodwill" within the meaning of the statute and promulgated a regulation that treated capital credits in the same manner as supervisory goodwill. 12 C.F.R. § 567.1(w).

As a result of FIRREA and the OTS regulation, many thrifts that were previously in full compliance with the regulations on capital requirements failed to satisfy the new capital standards and immediately became subject to seizure. Glendale initially remained in compliance with the three new

capital standards of FIRREA even though it was required to exclude all the unamortized supervisory goodwill that resulted from its merger with Broward for purposes of calculating its tangible capital and was required to accelerate the amortization of supervisory goodwill in calculating its required core and risk-based capital requirements. However, Glendale had to implement costly new measures to compensate for the exclusion of much of its supervisory goodwill from regulatory capital. Later, in March 1992, Glendale fell out of compliance with the risk-based capital standard.

After FIRREA, Statesman immediately fell below the three new capital standards established by the Act. As a result, the OTS appointed the RTC as receiver for Statesman in July of 1990. Winstar also fell into noncompliance as soon as the FIRREA capital requirements became effective. Winstar was placed in receivership by the OTS in May of 1990.

D. The plaintiffs filed suit in the Court of Federal Claims alleging that under FIRREA the preclusion or limited availability to them of supervisory goodwill (and capital credits in the case of Statesman) for satisfying regulatory capital constituted a breach of contract or, in the alternative, a taking of their contract rights without compensation in violation of the Fifth Amendment. The plaintiffs claimed that the government was contractually obligated to recognize supervisory goodwill generated by the mergers (and capital credits) as an intangible capital asset for purposes of their compliance with minimum regulatory capital standards. The plaintiffs also claimed that they were entitled to amortize that supervisory goodwill for the agreed periods established at the time of their acquisitions of failing thrifts. Under their contract claims, plaintiffs asserted that FIRREA, and the regulations thereunder, as applied to them, breached those contract obligations. All of the plaintiffs filed summary judgment motions on the issue of liability.

The government defended on the grounds that there were no contractual rights as alleged and that in any event the alleged agreements were subject to statutory and regulatory changes. Relying principally on

*Bowen v. Public Agencies Opposed to Social Security Entrapment (POSSE),* 477 U.S. 41, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986), the government argued that the thrifts impermissibly sought to enjoin Congress' power to legislate and the agencies' power to regulate. The government further argued that the sovereign acts doctrine, as stated in *Horowitz v. United States,* 267 U.S. 458, 461, 45 S.Ct. 344, 344–45, 69 L.Ed. 736 (1925), precluded recovery for any contractual rights breached by FIRREA.

The Court of Federal Claims granted summary judgment to the plaintiffs on the issue of liability under the contract claims and did not reach the constitutional takings claims. The court found that binding contracts were made between plaintiffs and the FSLIC in each of the three merger transactions. It held that these contracts were breached when the regulatory capital requirements of FIRREA, and the regulations, were applied to plaintiffs. The Court of Federal Claims distinguished *POSSE* on the grounds that the case did not involve bargained for contract rights but rather involved an entitlement program. The court also distinguished *POSSE* because the relief sought was an injunction to prevent the government from acting in its sovereign capacity, whereas plaintiffs only claimed damages for breach of their contracts. Finally, the Court of Federal Claims found that FIRREA, in specifically limiting the use of supervisory goodwill that had previously been contractually authorized, was not a sovereign act but rather was aimed directly at thrifts with contracts like those of the plaintiffs. Thus, the court concluded that the government could not rely on the sovereign acts doctrine to shield it from liability.

### III

█ We review the Court of Federal Claims' grant of summary judgment under a *de novo* standard of review, with justifiable factual inferences being drawn in favor of the party opposing summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986). On appeal both parties ask for entry of judgment in their favor based on the uncontested facts of record.

A. The Court of Federal Claims found that all the thrifts had contracts with the government that contained terms allowing the use of supervisory goodwill (and in Statesman's case, capital credits) to satisfy a portion of their regulatory capital requirements and that this intangible asset could be amortized over extended periods of time. In the Glendale and Statesman cases, the court determined there were express contracts with these terms, and in Winstar's case, that there was an implied-in-fact contract with these terms. The government initially contends that no such contractual terms existed.

Contract construction is a question of law that we review *de novo*. *Hughes Communications Galaxy, Inc. v. United States*, 998 F.2d 953, 957 (Fed.Cir.1993). A principal objective in deciding what contractual language means is to discern the parties' intent at the time the contract was signed. *Arizona v. United States*, 575 F.2d 855, 863, 216 Ct.Cl. 221 (1978).

1. We agree with the Court of Federal Claims that the government had an express contractual obligation to permit Glendale to count the supervisory goodwill generated as a result of its merger with Broward as a capital asset for regulatory capital purposes. Similarly, as the trial court determined, under this agreement Glendale was entitled to amortize the major portion of that goodwill on a straight line basis for a period of 40 years, and the balance for 12 years.

The government contends that the FSLIC's SAA with Glendale is the only document evidencing Glendale's contract with the FSLIC and that it contains no promise relating to goodwill or its amortization. As noted by the Court of Federal Claims, however, Glendale's contract was not limited to the SAA itself, but also included the contemporaneous resolutions and letters issued by the FSLIC and the Bank Board. The SAA's integration clause provided:

> This Agreement, together with an interpretation thereof or understanding agreed to in writing by the parties, constitutes the entire agreement between the parties thereto and supersedes all prior agreements and understandings of the parties in connection herewith, *excepting only the Agreement of Merger and any resolutions or letters issued contemporaneously herewith by the [Bank Board] or the FSLIC,* provided, however, that in the event of any conflict, variance, or inconsistency between this Agreement and the Agreement of Merger, the provisions of this Agreement shall govern and be binding on all parties insofar as the rights, privileges, duties, obligations, and liabilities of the FSLIC are concerned.

(Emphasis added.)

One of these contemporaneous documents, which was relied on by the Court of Federal Claims, was Bank Board Resolution 81–710. The FSLIC needed the Bank Board's approval before it could enter into the SAA with Glendale and approve the merger. The FSLIC and Glendale had negotiated the terms of the Broward merger, including Glendale's proposed use of supervisory goodwill and Glendale's obligation to absorb Broward's deposit liabilities. After negotiating terms satisfactory to both parties, the FSLIC recommended to the Bank Board that it approve the merger and authorize the FSLIC to execute the SAA with Glendale.

Resolution 81–710 provided the Bank Board's approval, with certain conditions that Glendale was required to satisfy to the Bank Board's satisfaction, including the following:

> Not later than sixty days following the effective date of the merger, Glendale shall furnish an opinion from its independent accountant, satisfactory to the Supervisory Agent, which (a) indicates the justification under generally accepted accounting principles for the use of the purchase method of accounting for its merger with Broward, (b) specifically describes, as of the Effective Date, any goodwill or discount of assets arising from the merger to be recorded on Glendale's books, and (c) substantiates the reasonableness of amounts attributed to goodwill and the discount of assets and the resulting amortization periods and methods. . . .

The Resolution continued:

> Glendale shall submit a stipulation that any goodwill arising from this transaction shall be determined and amortized in ac-

cordance with [Bank Board] Memorandum R–31b....

Memorandum R–31b (1981) was the Bank Board's "guidelines" on how an acquiring thrift could count the excess of the acquired thrift's purchase price over the acquired thrift's fair market value as an intangible asset under the purchase method of accounting.[4]

Thus, in Resolution 81–710, the Bank Board clearly evidenced its approval of the terms of the merger, including the terms that the purchase method of accounting would be employed in accounting for the merger, that goodwill arising from the merger would be recorded on Glendale's books, and that such goodwill would be amortized for reasonable periods under reasonable methods, provided these accounting treatments were justified to the satisfaction of the Bank Board's supervisory agent. In this connection, the Court of Federal Claims observed:

It is also uncontroverted that the government manifested its approval of the terms set forth in the opinion letter prior to the effective date of the Supervisory Action Agreement. In a letter from H. Brent Beesley, then-Director of FSLIC, to [Bank Board] dated November 19, 1981, FSLIC recommended the use of the purchase method of accounting for the merger. Beesley explicitly referred to a Peat, Marwick, Mitchell & Co. opinion letter dated November 10, 1981 setting forth the specific amount of supervisory goodwill projected to be amortized pursuant to the merger, assuming the use of the purchase method of accounting.

26 Cl.Ct. at 910.

After the merger, Glendale submitted the required letter from its independent accountants to the Bank Board's supervisory agent. The letter confirmed as of the date of closing the amount of goodwill resulting from the merger under the purchase method of accounting and reiterated the amortization periods and the amounts of goodwill to be amortized under each period.

Pursuant to the provisions of the Agreement of Merger between [Glendale] and Broward dated November 20, 1981 and the Supervisory Action Agreement between [Glendale] and the Federal Savings and Loan Insurance Corporation (FSLIC) dated November 20, 1981, upon the effective date of November 20, 1981, [Glendale] accounted for the acquisition using the "Purchase Method" of accounting....

....

... $18,000,000 of the resultant goodwill is associated with the savings deposit base and will be amortized on a straight line basis over 12 years, the estimated life of the savings deposit base. The remaining goodwill of $716,666,000 will be amortized on a straight line basis over 40 years as [Glendale] believes that the remaining goodwill has an indefinite life since it is related to expansion of operations into an entirely new market area.

The letter further opined that the accounting and methodology for calculating supervisory goodwill were in accordance with generally accepted accounting principles. Glendale satisfied the conditions for merger approval set out in Resolution 81–710 by submitting both the independent accountants' opinion and the stipulation that the accounting was in accordance with Memorandum R–31b. Moreover, there is no dispute that these submissions were satisfactory to the Bank Board's supervisory agent as required by that Resolution.

We conclude based on all of the contemporaneous documents, which under the integration clause of the SAA collectively constituted the "Agreement" of the parties, that the Bank Board and the FSLIC were contractually bound to recognize the supervisory goodwill and the amortization periods re-

---

4. The Memorandum provided that:

An application from an association requesting approval for a business combination to be accounted for by the purchase method of accounting, from which intangible assets will result, should include a description of any resulting intangible assets and the plan for their amortization. This description should discuss the nature and results of management's analysis of the underlying intangible assets and the resulting amortization periods and methods. In accordance with applicable accounting principles, the Memorandum limited the period of amortization to 40 years or less.

flected in the approved accountants' letter. It is clear from the documents that this was the intent of the parties. Glendale consummated its merger with Broward on this understanding and in doing so saved the government hundreds of millions of dollars.

Our conclusion is supported by other evidence and by the circumstances surrounding the transaction. If the parties did not intend to use supervisory goodwill for regulatory capital purposes there would simply be no reason for the extensive negotiations and the conditions regarding its use. It is not disputed that if supervisory goodwill had not been available for purposes of meeting regulatory capital requirements, the merged thrift would have been subject to regulatory noncompliance and penalties from the moment of its creation.[5] Moreover, the recitals of the SAA state that "Glendale proposes to enter into an agreement of merger with [Broward]" and that Broward "is in danger of default and that the nature and/or amount of such assistance would be less than the losses FSLIC would sustain upon the liquidation of [Broward]." Without the use of supervisory goodwill, the merged thrifts would have been in a failing position resulting in the losses the FSLIC sought to avoid. Finally, it is appropriate to observe that no healthy thrift would consummate a transaction that immediately put it in regulatory noncompliance.

We consider the government's argument that the Bank Board Resolution was merely a statement of "then-current prosecutorial and regulatory policy" to be of little significance. Once specific terms as to the amount of supervisory goodwill and its amortization periods under that regulatory policy were incorporated in a negotiated arm's length contract, both parties were bound to them. While it is true as the government argues that a statement of policy, for instance as set forth in Memorandum R–31b, could be changed (which it later was), the contract could not be changed except by mutual consent.

The government makes two additional arguments why the Court of Federal Claims' interpretation was wrong. First it contends that the SAA expired by its terms in November 1991, prior to the alleged breach. We view the expiration provision as only relating to executory provisions set out in the SAA, which obligated the FSLIC to make certain payments to the merged thrift for a limited period of time. This provision of the SAA in any event does not negate other obligations under the merger plan, including the specific time periods for amortization of goodwill.

The government's second argument is based on the clause contained in the SAA, which provides that: "Nothing in this Agreement shall require any unlawful action or inaction by either of the parties hereto." The government contends this clause contemplates possible future changes in the law. The proper reading of this clause, however, is that neither party is required to act to the extent that some portion of the contract inadvertently violated the law as it existed at the time the contract was entered into. In any case, the clause clearly is not an escape hatch that allows the federal government to avoid performance of its contractual obligations without penalty by passing a law prohibiting its own performance.

2. The Statesman transaction involved the acquisition by merger of four failing thrifts, and thus the accompanying documentation was more complex than that in the Glendale transaction. The Court of Federal Claims determined an express contract existed between the plaintiffs and the government which permitted the use of supervisory goodwill and capital credits in meeting regulatory capital levels, and which established the amortization period for such goodwill. We agree.

In connection with the acquisition of the four thrifts, Statesman signed an Assistance Agreement with the FSLIC. The Assistance Agreement contained express terms that allowed capital credits to be used to satisfy regulatory capital. Not surprisingly, the

---

**5.** Prior to the merger, Glendale was a healthy, fully capitalized thrift. Glendale asserts, and the government does not disagree, that after merging with Broward Glendale's regulatory net worth would have been negative $460 million if supervisory goodwill had not been counted as a capital asset.

Court of Federal Claims stated that "the government readily concedes that an express contract existed, at least in regard to the $26 million capital credit extended by the government to Statesman." 26 Cl.Ct. at 912. A similar concession has been made by the government in its appeal brief, which states:

> The terms of the Assistance Agreement provided that $26 million of that amount (the "capital credit") constituted RAP goodwill to be credited to Statesman's regulatory capital.

Thus, although the government maintains these terms were not insulated against changes in the law, there can be no doubt that contractual promises regarding capital credits were made.

The Statesman documents regarding the treatment of supervisory goodwill are, in substance, the same as those in the Glendale transaction. The Assistance Agreement contained an integration clause that incorporated contemporaneous resolutions of the Bank Board. The Bank Board's Resolution 88–169 approved the Statesman merger plan and authorized the FSLIC to enter into the Assistance Agreement. In contrast to the Glendale resolution, however, Resolution No. 88–169 expressly approved and described the accounting treatments to be used in the Statesman merger transaction, as follows:

> [T]he Acquisition and the Mergers shall be accounted for, and [Statesman] shall report to the Bank Board and the FSLIC, in accordance with generally accepted accounting principles prevailing in the savings and loan industry, as accepted, modified, clarified, or interpreted by applicable regulations of the Bank Board and the FSLIC, except to the extent of the following departures from generally accepted accounting principles:
>
> (a) Twenty-one million dollars of the initial contribution by the [FSLIC] to [Statesman], and five million dollars of the principal amount of the Subordinated Debenture issued to the FSLIC, pursuant to § 6 of the Assistance Agreement, shall be credited to the regulatory capital account of [Statesman]; and
>
> (b) The value of any unidentifiable intangible assets resulting from accounting

for the Acquisition and the Mergers in accordance with the purchase method of accounting may be amortized by [Statesman] over a period not in excess of twenty-five (25) years by the straight line method....

As stated in the government's appeal brief:

> The Bank Board resolution also permitted use of the purchase method of accounting for the acquisitions. Thus, Statesman was allowed to amortize $25.8 million more in supervisory goodwill for 25 years.

As it did in the Glendale transaction, the Bank Board reserved its approval of this accounting treatment until Statesman furnished within ninety days, "an analysis accompanied by a concurring opinion from its independent certified public accountants" which

> shall (a) specifically describe, as of the Effective Date, any intangible assets, including goodwill and the discount and premiums arising from the Acquisition and the Mergers, to be recorded on New Federal's books, and (b) substantiate the reasonableness and conformity with regulatory requirements of the amounts attributed to intangible assets, including goodwill and the discount and premiums, and the related amortization periods and methods....

The government concedes that this condition was met to the Board's satisfaction.

We conclude that the government was contractually obligated to recognize the capital credits and the supervisory goodwill generated by the merger as part of the Statesman's regulatory capital requirement and to permit such goodwill to be amortized on a straight line basis over 25 years.

3. The Court of Federal Claims concluded that Winstar had an implied-in-fact contract that obligated the government to allow Winstar to treat supervisory goodwill as a capital asset for regulatory capital purposes to be amortized over a 35 year period. Because we are satisfied that an express agreement existed between the FSLIC and Winstar, on the same terms found by the Court of Federal Claims, we do not reach the question of whether there could also be an implied-in-fact contract.

In July 1984 Winstar entered into an Assistance Agreement with the FSLIC. The Assistance Agreement stated that "the purpose of this Agreement [is] to provide a means by which the failure of [Windom] may be prevented, the savers and other creditors of [Windom] may be protected against losses . . . , [United] and Winstar may receive the benefits and assume the risks contracted for, and expenses to [the FSLIC] may be reduced." While this purpose recognized there was a mutual exchange of benefits and risks in the agreement, Winstar's Assistance Agreement, like Glendale's SAA, did not directly cover the treatment of supervisory goodwill. Again, however, this Assistance Agreement contained an integration clause which made "the Merger Agreement and any resolutions or letters issued contemporaneously with [the Assistance Agreement]" part of the contract between the parties.

Among the documents evidencing the government's contractual obligation is a forbearance letter of the Bank Board issued in July of 1984 to the Winstar investors. The forbearance letter in the first paragraph states the purpose is to "confirm the understanding that," after which it proceeds to enumerate several terms of the Winstar transaction. Paragraph 2 of those terms provides:

> For purposes of reporting to the Board, the value of any intangible assets resulting from accounting for the merger in accordance with the purchase method may be amortized by [Winstar] over a period not to exceed 35 years by the straight-line method. . . .

The other documentation in the Winstar transaction is substantially identical to that in the Glendale transaction with respect to accounting treatment for the merger. For example, there is a contemporaneous Bank Board resolution, Resolution 84–363, approving the Winstar merger and giving the FSLIC the authority to proceed. That resolution required Winstar to provide an opinion "from its independent public accountants, satisfactory to the Supervisory Agent and to the Office of Examinations and Supervision" describing the use of goodwill and substantiating its reasonableness and conformity with regulatory requirements. It is not contested that Winstar satisfied the conditions in Resolution 84–363 to the Bank Board's satisfaction.

We conclude that the documentation in the Winstar transaction establishes an express agreement allowing Winstar to proceed with the merger plan approved by the Bank Board, including the recording of supervisory goodwill as a capital asset for regulatory capital purposes to be amortized over 35 years. Other circumstances, such as those discussed above in connection with the Glendale transaction, are consistent with this conclusion and demonstrate that it was the intention of the parties to be bound by the accounting treatment for goodwill arising in the merger. Likewise, we find the government's arguments regarding the expiration of the Assistance Agreement and the Agreement's "unlawful action" provision unpersuasive for the same reasons as in the Glendale transaction.

Finally, the government argues the Net Worth Maintenance Stipulation signed by Winstar required Winstar to abide by any changes in the law regarding regulatory capital. We agree to the extent the Stipulation requires Winstar to maintain its capital at levels set by the bank regulators. Winstar, like other thrifts, was bound to keep in compliance with banking regulations and laws regarding capital levels except to the extent the Bank Board expressly agreed to forbear from enforcing its regulations against it. This stipulation by Winstar to maintain its regulatory net worth at whatever level the regulators set does not, however, eclipse the government's own promise that Winstar could count supervisory goodwill in meeting the regulatory requirements with which it had promised to comply.

B. There can be little question that the application of FIRREA and the regulations thereunder to deny or restrict plaintiffs' contractual rights to use supervisory goodwill with the associated amortization periods, and for Statesman's capital credits, in partial satisfaction of their capital requirements was a breach of the FSLIC's and the Bank Board's agreements with them. FIRREA greatly reduced the amount of supervisory goodwill that could be used to meet regulatory capital

requirements. *See* 12 U.S.C. § 1464(t). The OTS by regulation treated capital credits in the same manner as supervisory goodwill, *see* 12 C.F.R. § 567.1(w), thereby restricting the use of such credits for regulatory capital purposes.[6]

Failure to perform a contractual duty when it is due is a breach of the contract. *Restatement (Second) of Contracts* § 235(2) (1981). The three plaintiff thrifts negotiated contracts with the bank regulatory agencies that allowed them to include supervisory goodwill (and capital credits) as assets for regulatory capital purposes and to amortize that supervisory goodwill over extended periods of time. When the plaintiffs satisfied the conditions imposed on them by the contracts, the government's contractual obligations became effective and required it to recognize and accept the purchase method of accounting for the mergers and the use of supervisory goodwill and capital credits as capital assets for regulatory capital requirements.

After FIRREA and its implementing regulations, the bank regulatory agencies limited these assets as acceptable regulatory capital and limited the amortization periods. As a result, Winstar and Statesman were immediately thrown into noncompliance with the new regulatory capital requirements and were seized by federal regulators within approximately six months. Glendale survived the new capital standards but at considerable detriment. We conclude the government failed to perform its contractual obligations under plaintiffs' contracts.

C. The government makes two additional arguments why the thrifts' claims must fail. It contends (1) that the contracts failed to secure unmistakably the government's contractual obligations in the face of legislative change (the "unmistakability doctrine") and (2) that the government's contractual obligations were relieved by the enactment of "public and general" legislation by the Congress (the "sovereign acts doctrine"). The Court of Federal Claims analyzed each of these arguments extensively in its opinions and found neither to be persuasive. We

agree with, and adopt, the substance of these analyses. *See Winstar I*, 21 Cl.Ct. at 115–17; *Winstar II*, 25 Cl.Ct. at 544–53; *Statesman*, 26 Cl.Ct. at 916–24.

■ 1. The government contends that interpreting the contracts at issue as guaranteeing certain accounting treatments in spite of Congress' enactment of FIRREA is a restriction on the government's power to legislate. The Supreme Court's decision in *POSSE*, 477 U.S. at 52, 106 S.Ct. at 2397, is cited for the proposition that in interpreting contracts to which the government is a party, the contract should not be construed as waiving the government's power to legislate unless it says so in unmistakable terms. In *POSSE* the Court, quoting *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 148, 102 S.Ct. 894, 907, 71 L.Ed.2d 21 (1982), stated:

> [W]e have emphasized that "[w]ithout regard to its source, sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms." Therefore, contractual arrangements, including those to which a sovereign itself is party, "remain subject to subsequent legislation" by the sovereign.

*POSSE*, 477 U.S. at 52, 106 S.Ct. at 2397 (citations omitted). In its briefs on appeal and in the proceedings below, the government also relied heavily on the opinion of the District of Columbia Circuit in *Transohio Sav. Bank v. Director, Office of Thrift Supervision*, 967 F.2d 598 (D.C.Cir.1992). (As explained below, *Transohio* was modified by the District of Columbia Circuit after the in banc arguments in the instant cases.) Because none of the thrifts can point to express language in their contracts preserving their contractual rights in the face of legislative change, the government concludes that the contracts must yield to the later enacted FIRREA capital requirements.

The Court of Federal Claims in its first *Winstar* opinion, 21 Cl.Ct. at 115, viewed *POSSE* as being inapposite because the gov-

---

**6.** Because we affirm the Court of Federal Claims' decision in this case, we need not reach the question of whether FIRREA contemplated that capital credits would be treated as a form of supervisory goodwill.

ernment "mischaracterize[s] the plaintiffs' claim as one which improperly seeks to bind the government's power to regulate." Rather, the court noted that plaintiffs sought only money damages, which did not implicate the government's power to regulate. Thereafter, in its *Winstar II* opinion considering the government's motion for clarification, the Court of Federal Claims held that *POSSE* did not preclude finding a binding contract that had been breached by the government, explaining its holding as follows:

> Contrary to the assertions of the government, the Court's holding in *POSSE* in no way precludes this court from finding the existence of a contract between the government and plaintiffs. As is evident from its opinion, the Court in *POSSE* recognized that the government has the power to enter into contracts which confer vested rights—rights which the government has a duty to honor. *See Perry v. United States,* 294 U.S. 330, 351 [55 S.Ct. 432, 435, 79 L.Ed. 912] (1935) ("To say that the Congress may withdraw or ignore [its] pledge, is to assume that the Constitution contemplates a vain promise, a pledge having no other sanction than the pleasure and convenience of the pledgor. This Court has given no sanction to such a conception of the obligations of our Government."); *Lynch v. United States,* 292 U.S. 571, 580 [54 S.Ct. 840, 844, 78 L.Ed. 1434] (1934) ("Congress was free to reduce gratuities deemed excessive. But Congress was without power to reduce expenditures by abrogating contractual obligations of the United States. To abrogate contracts, in the attempt to lessen government expenditure, would be not the practice of economy, but an act of repudiation.").

> In *POSSE,* however, unlike the case here, no such vested rights were created as the basic elements of contract formation were absent. In contracts involving the government, as with all contractual relationships, rights vest and contract terms become binding when, after arms length negotiation, all parties to the contract agree to exchange real obligations for real benefits. In *POSSE,* the Court determined that such vested contract rights did not exist. *POSSE,* 477 U.S. at 52, 54–55

[106 S.Ct. at 2396–97, 2397–98]. Although the Court did not explicitly so state, the facts of *POSSE* make it clear that the provisions of the original Social Security Act were not promulgated after negotiation, arms length or otherwise, between Congress and the plaintiffs who filed suit. As is the case with all legislation, the only "negotiations" or bargaining involved in the enactment of the original Social Security Act and its amendments took place in the halls of Congress. The "rights" at issue in *POSSE,* then, were solely government-created. They were really policy decisions made by the democratic political process. There was no legal consideration for the creation of these "rights." At any time, the government could revoke them *without legal consequence* because the plaintiffs had not bargained for their creation.

25 Cl.Ct. at 545–46 (footnotes omitted) (emphasis in original). The Court of Federal Claims returned to the government's unmistakability argument again in its opinion in the *Statesman* case. By this time the District of Columbia Circuit had issued its opinion in *Transohio,* which the government argued supported the unmistakability argument it had made in *Winstar.*

In *Transohio,* the plaintiff was a healthy thrift that merged with a failing one upon signing an Assistance Agreement with the FSLIC. After FIRREA was enacted, Transohio sought a preliminary injunction to enjoin the government from applying FIRREA's provisions against the use of supervisory goodwill as regulatory capital. It argued that FIRREA would breach the government's Assistance Agreement and that there would be a taking of Transohio's property under the Fifth Amendment.

The D.C. Circuit affirmed the district court's denial of the injunction because Transohio was unlikely to succeed on the merits. *Transohio,* 967 F.2d at 601. While noting the district court had no jurisdiction over the breach of contract claims, the D.C. Circuit analyzed whether Transohio had any contractual property rights that were protected under the due process clause of the Fifth Amendment. *Id.* at 617. The court

agreed there was a contract right for the treatment of goodwill, *id.* at 618 ("We think the documents strongly suggest that, in addition to money, the agencies gave Transohio some ability to count as regulatory capital the intangible assets created by its mergers."), but concluded that the unmistakability doctrine precluded an interpretation of the contract that would guarantee such treatment against legislative change. *Id.* at 620. Because the thrift's contract and taking claims were both dependent on the existence of a binding contract, the court stated there was no need to remand the case to consider the thrift's monetary claims in the Court of Federal Claims. *Id.* at 614.

The government argued to the Court of Federal Claims that *Transohio* was persuasive precedent against interpreting the thrift agreements as allowing recovery for contractual breach in the face of legislative change. The Court of Federal Claims was unpersuaded and criticized the *Transohio* court's use of the unmistakability doctrine as one of contract interpretation rather than one of contract creation.

The purpose animating the unmistakability doctrine makes it clear that the doctrine controls how contractual rights with the government are *created, i.e.,* whether the government has agreed in unmistakable terms to be contractually bound. The doctrine never has been understood as controlling, as the government has alleged in the *Winstar*-related cases, the effect of the government's breach of a contract. *See United States Trust Co. v. New Jersey,* [431 U.S. 1, 23, 97 S.Ct. 1505, 1518, 52 L.Ed.2d 92 (1977) ] ("Th[e] [unmistakability] doctrine requires a determination of the State's power to create irrevocable contract rights in the first place, rather than an inquiry into the purpose or reasonableness of the subsequent impairment."). The doctrine solely goes to whether a party possesses contractual rights which are binding and for which damages may be given.

Thus, in *Winstar* and the instant cases, there has been little serious dispute that the government granted the acquiring thrifts, in the clearest possible terms, the

right to certain types of regulatory capital treatment. Likewise, the acquiring thrifts have never contended in this court that the government is bound to specifically perform on this obligation. Rather, the dispute has primarily raged over the question of breach. Namely, whether the government must pay damages or provide restitution for its breach, or whether it is excused from such damages by an interpretation of *POSSE* or the sovereign acts doctrine. The historical understanding of the unmistakability doctrine is not applicable to this issue.

26 Cl.Ct. at 920.

We agree with the Court of Federal Claims' view on the unmistakability doctrine. The terms of a government contract, like any other contract, do not change with the enactment of subsequent legislation absent a specific contractual provision providing for such a change. Further, we conclude the Court of Federal Claims properly rejected the government's argument based on *POSSE* that its sovereign power to legislate is at issue here. As the Court of Federal Claims observed:

It is critical to this case ... that plaintiffs are not claiming that the government contractually bound Congress not to change its regulations. Rather, plaintiffs claim that in their particular transaction with the government, it was agreed that they would be permitted to treat supervisory goodwill in a particular way for a fixed number of years. Thus, while Congress' power to regulate is not impaired, the government may be compelled to pay for the results of its actions, especially when in so doing the government actually is paying because it received a benefit.

*Winstar I,* 21 Cl.Ct. at 116.

The thrifts did not ask for, and the Court of Federal Claims could not provide, injunctive relief that would have enjoined the thrift regulators from applying the FIRREA requirements to the thrifts. *See Kanemoto v. United States Dep't of Justice,* 41 F.3d 641, 644 (Fed.Cir.1994). Rather the thrifts sought money damages for breach of contract by the government. Money damages, in contrast to injunctive relief, presents little threat to the government's sovereign powers,

other than the obvious financial incentive to honor its contracts. The Supreme Court's decision in *POSSE* is predicated on the need to protect the sovereign's legislative power and that concern is inapplicable where money damages alone are at issue. *Hughes Communications,* 998 F.2d at 958 (distinguishing *POSSE* and other unmistakability cases as cases seeking to enjoin the sovereign power to legislate from cases in the Court of Federal Claims where the plaintiff seeks only money damages). In sum, Congress was always free to deem supervisory goodwill a bad idea and legislate it out of existence. Where that legislation breached the government's prior contractual obligations regarding the treatment of supervisory goodwill, however, the government remains liable in money damages for the breach.

Significantly, after the *Winstar* and *Statesman* cases were argued to this court sitting in banc, the D.C. Circuit in a later proceeding in the *Transohio* case reconsidered its earlier position. *See Transcapital Fin. Corp. v. Director, Office of Thrift Supervision,* 44 F.3d 1023 (D.C.Cir.1995). The court recognized that its prior decision concerned only the denial of injunctive relief, and stated that its "analysis has no bearing one way or the other on the merits of [Transohio's] claim for *compensation* in the Federal Court of Claims [sic]." At 1026. (emphasis in the original). Thus the *Transohio* decision, as modified, complements our decision. In *Transohio,* the thrift sought to enjoin the government on the basis of its contractual rights and the court ruled it could not do so. In the present case, the thrifts seek only money damages with no request to enjoin the government. Accordingly, the sovereign's power to legislate is not here at issue, only money damages because the FIRREA legislation has breached the contracts.

We are also persuaded, as the Court of Federal Claims held, that the Bank Board and the FSLIC, as the principal regulators of the thrift industry, were fully empowered to enter into the contracts at issue here. Since its inception, the FSLIC has had the power "[t]o make contracts." 12 U.S.C. § 1725(c)(3) (repealed). The FSLIC and its supervisory agency, the Bank Board, have had the authority both to extend assistance to acquirers of insolvent FSLIC-insured thrifts, 12 U.S.C. § 1729(f)(2)(A) (repealed), and to set minimum capital limits on a case-by-case basis, 12 U.S.C. § 1730(t)(2) (repealed). Although the FSLIC's authority to provide assistance could not exceed the cost of liquidating the thrift, in each of the transactions on appeal the government was saving millions of dollars over the cost of liquidation.

■ 2. Finally, the government argues that FIRREA was a public and general sovereign act and that the government's contractual performance is excused when it is precluded by such an act. Citing the leading case on the sovereign acts doctrine, *Horowitz v. United States,* 267 U.S. 458, 461, 45 S.Ct. 344, 344–45, 69 L.Ed. 736 (1925), the government contends that FIRREA was a public and general act that excused its contractual performance. We agree, however, with the Court of Federal Claims that the relevant sections of FIRREA are not public and general sovereign acts. Therefore, the sovereign acts doctrine does not apply.

■ "[T]he United States when sued as a contractor cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign." *Horowitz,* 267 U.S. at 461, 45 S.Ct. at 344 (citations omitted). The sovereign acts doctrine is a part of every contract with the government, whether the contract explicitly provides for it or not. *Hughes Communications,* 998 F.2d at 958. *Horowitz* makes clear that the sovereign acts doctrine is intended to level the playing field between the government and its contractors. "In this court the United States appear simply as contractors; and they are to be held liable only within the same limits that any other defendant would be in any other court. Though their sovereign acts performed for the general good may work injury to some private contractors, such parties gain nothing by having the United States as their defendants." *Horowitz,* 267 U.S. at 461, 45 S.Ct. at 345 (quoting *Jones v. United States,* 1 Ct.Cl. 383, 384, 1865 WL 1976 (1865)).

■ Not every governmental action, however, qualifies as a sovereign act within the

meaning of the doctrine. Only those "public and general acts as a sovereign" qualify. While presumably all government action is enacted for the good of the public, government action whose principal effect is to abrogate specific contractual rights does not immunize the government from contractual liability under the doctrine. *Everett Plywood Corp. v. United States,* 651 F.2d 723, 731–32, 227 Ct.Cl. 415 (1981); *Sun Oil Co. v. United States,* 572 F.2d 786, 817, 215 Ct.Cl. 716 (1978). As noted by the Court of Federal Claims in its *Winstar II* decision:

> [W]here the government abrogates through a limited and focused action specific government obligations to a particular class of individuals or entities it has contracted with, the government is not afforded immunity. In these instances, the government acts not in its capacity as sovereign, but in its capacity as contractor.

25 Cl.Ct. at 551 (citations omitted).

The Court of Federal Claims determined with respect to the Winstar transaction:

> The pertinent sections of FIRREA at issue here, 12 U.S.C. § 1464(t)(3)(A) and (9)(B), preclude the application of the sovereign acts doctrine. Their very purpose was to take away plaintiffs' rights to use supervisory goodwill because the Congress felt its use was no longer good policy. Courts assessing sovereign act claims have not granted immunity where the sole purpose of the government action is to reverse an earlier policy decision later deemed unwise.

*Id.* at 552 (citations and footnotes omitted). The government argues the Court of Federal Claims erred in concluding that the pertinent FIRREA sections were directed only at thrifts with agreements with the FSLIC. In its brief, the government contends "[t]he FIRREA goodwill restrictions apply to *all* thrifts, whether they previously had goodwill created or may undertake transactions that create goodwill in the future, and whether or not they had contracts assertedly freezing the prior regulatory treatment of goodwill." (Emphasis in original.)

The relevant provisions of FIRREA are 12 U.S.C. §§ 1464(t)(3)(A) and 1464(t)(9)(A)–(C). Section 1464(t)(9)(A) defines "core capital" as that "defined by the Comptroller of the Currency for national banks, less any unidentifiable intangible assets...." Goodwill is one form of an "unidentifiable intangible asset." An exception to the rule against intangible assets being includable in core capital is set forth in the transition rule at § 1464(t)(3)(A). That section provides "[n]otwithstanding paragraph 9(A), an eligible savings association may include qualifying supervisory goodwill in calculating core capital." 12 U.S.C. § 1464(t)(3)(A). The section then provides a table that limits the amount of qualifying supervisory goodwill until it is totally phased out in 1995. Section 1464(t)(9)(C) provides the definition of "tangible" capital, which excludes all intangible assets, including supervisory goodwill. Section 1464(t)(9)(B) defines "qualifying supervisory goodwill" as supervisory goodwill existing on April 12, 1989 and limits the amortization period of qualifying supervisory goodwill to the shorter of 20 years or the remaining amortization period in effect on April 12, 1989.

The statute plainly singles out supervisory goodwill for special treatment, albeit treatment less harsh than other forms of intangible assets. Supervisory goodwill only results from a supervisory merger, a merger that necessarily required the participation of the FSLIC.[7] Thus, thrifts that underwent a supervisory merger, like appellants, are singled out for special treatment by the statute. The statute specifically limits their ability to include certain assets in their calculation of capital. Although there is no doubt Congress passed this legislation out of concern about the use of "accounting gimmicks" behind the insured deposits, the legislation quite specifically abrogates agreements the government had made at an earlier time

---

7. *See* House Report at 432, 1989 U.S.C.C.A.N. at 228:

> [T]he Committee intends the term "supervisory goodwill" to mean goodwill resulting from the acquisition, merger, consolidation, purchase of assets or other business combination of any savings association where the market value of the assets acquired was less than the market value of the liabilities at the time of the transaction and where the accounting treatment of the goodwill has been approved by the Federal Home Loan Bank Board.

when it had suggested and approved the use of such "gimmicks" to avoid bailing out failing thrifts.

The legislative history behind FIRREA demonstrates that those debating the bill in Congress knew that some thrifts claimed to have contractual rights regarding the use of supervisory goodwill and that the subject provisions would breach those contracts. Three members of the House Committee on Banking, Finance and Foreign Affairs stated in response to the House version of FIRREA:

> Unfortunately, [FIRREA] was amended by the Full Committee to phase out the treatment of goodwill for capital purposes over a five year period. Simply put, the Committee has reneged on the agreements that the government entered into concerning supervisory goodwill.
>
> ... Clearly, the agreements concerning the treatment of goodwill were part of what the institutions had bargained for. Just as clearly, the Committee is abrogating those agreements.

House Report at 498, 1989 U.S.C.C.A.N. at 293–94 (additional views of Reps. Annunzio, Kanjorski, and Flake). Representative Ackerman argued that "[FIRREA] would abrogate written agreements made by the U.S. Government to thrifts that acquired failing institutions by ... no longer counting goodwill as capital after a 4–year transition period. In effect, the Government is saying 'thanks for your help, but we don't need you anymore, so we're breaking our promise.' " 135 Cong.Rec. H2783 (daily ed. June 15, 1989). These remarks, which are by no means exhaustive, illustrate that many in Congress were concerned about FIRREA's repudiation of the supervisory goodwill promises made in the thrift agreements.

One of the dissents argues that because the pertinent sections were part of a "comprehensive piece of national legislation" enacted by Congress, the sections are general and public acts that excuse the government's contractual performance. We disagree. First, the portions of FIRREA at issue in this case are not any less directed at thrifts that had supervisory mergers because they are part of "comprehensive" legislation. By definition, the pertinent sections apply only to supervisory goodwill, which could only occur as a result of a supervisory merger, that was in existence on April 12, 1989. The legislation plainly singles out thrifts that underwent supervisory mergers for special treatment.

Second, we do not find the dissent's attempt to distinguish *Sun Oil* and *Everett Plywood* as cases limited to agency action persuasive. There is no reason to distinguish action by the legislative branch from that of the executive branch. Indeed, the agencies in the executive branch receive their power to enter into the contracts from the legislative branch. The contracts the agencies properly enter into are not binding only at the grace of the legislative branch. Thus the *Horowitz* case makes no distinction between the acts of the coordinate branches of government. *See* 267 U.S. at 461, 45 S.Ct. at 344 ("be they legislative or executive").

Finally, we know of no authority for this dissent's position that the government has a sovereign right to disavow its contractual obligations through comprehensive national legislation. Such a proposition is not supported by *Horowitz* and cannot be reconciled with the decisions of the Supreme Court in *Lynch v. United States*, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934) and *Perry v. United States*, 294 U.S. 330, 55 S.Ct. 432, 79 L.Ed. 912 (1935). These decisions belie the notion that the government may repudiate its contracts by merely claiming it is acting in its "sovereign" capacity.

We accept, as did the Court of Federal Claims, that FIRREA was enacted for the public welfare—presumably all legislation is. We are convinced, however, that the FIRREA provisions at issue here targeted thrifts that had undergone supervisory mergers, financed in part with supervisory goodwill, with the approval and assistance of the federal government. Moreover, the undisputed reason for limiting the use of the supervisory goodwill was precisely the reason the government used it in the first place—it is a money equivalent, not money. The government has plainly sought to render its own performance impossible. This is not a public and general

act. The sovereign acts doctrine does not apply.

## CONCLUSION

There is nothing extraordinary about the contracts in these cases save for their subject matter and the potential liability to the government. It is well established that the government may enter into contracts with private individuals as parties. *See Perry v. United States,* 294 U.S. 330, 353, 55 S.Ct. 432, 436, 79 L.Ed. 912 (1935) ("[T]he right to make binding obligations is a competence attaching to sovereignty.") (footnote omitted). Our decision is consistent with long standing precedent that when the government enters into such contracts, "its rights and duties therein are governed generally by the law applicable to contracts between private individuals." *Lynch v. United States,* 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934) (footnote omitted); *see also Perry,* 294 U.S. at 352, 55 S.Ct. at 435 ("When the United States, with constitutional authority, makes contracts, it has rights and incurs responsibilities similar to those of individuals who are parties to such instruments.").

We conclude the thrifts' contracts are enforceable against the government and that the government bargained to allow the thrifts to count certain intangible assets created in their mergers as capital assets for specified periods of time. The government later exercised its sovereign prerogative to enact legislation to limit the use of these intangible assets towards meeting capital requirements. Although the government was free to legislate, it remains liable for breach of contract where its legislation is directed at repudiating its prior contractual agreements. We conclude FIRREA repudiated the government's agreements with the plaintiff thrifts. Accordingly, we affirm the liability judgments of the Court of Federal Claims.

*AFFIRMED.*

---

* The "purchase method of accounting," in some circumstances, may be "generally accepted accounting practice," but the thrifts could not use that practice to create nonexistent capital as a

NIES, *Circuit Judge,* dissenting.

Following *in banc* rehearing, additional briefing, and Chief Judge Archer's thoughtful opinion, I have reviewed my position in this appeal which is set out at 994 F.2d 797–813. However, I cannot agree that Congress "breached" contracts between the plaintiffs and the "government," that is, the Bank Board and FSLIC, by enacting FIRREA. The majority's holding impermissibly fuses "the two characters which the government possesses as a contractor and as a sovereign." *Horowitz v. United States,* 267 U.S. 458, 461, 45 S.Ct. 344, 69 L.Ed. 736 (1925). In my view, the plaintiffs can assert only a claim for an alleged taking of their property by the legislation, a claim which remains to be litigated. This is not a mere technicality. The amount of damages for a "taking" by legislation and for breach of contract are significantly different.

Further, I disagree that a breach of contract occurred even accepting that the Bank Board and the FSLIC were contractually bound to recognize supervisory goodwill * and particular amortization periods. While the regulators agreed to allow the thrifts to use their proposed accounting methods, that is as far as any contract with the "government" went. In the case of private parties, the burden of a change in the law is borne by the party on which it falls, unless responsibility is otherwise assigned in the contract. Contracting parties in that situation "gain nothing by having the United States as their defendants." *Id.* As delineated in my prior opinion, no clause can be found in the contracts under which the Bank Board and the FSLIC promised to pay if Congress decided to step in and do away with the "purchase method of accounting," a euphemism for spinning straw into gold, and other accounting gimmicks. In this highly regulated industry, the thrifts did not negotiate contracts that freed them from the risk of a change in regulations.

No one forced the plaintiffs into the acquisitions of failing S & L's. Each acted volun-

basis on which they could make loans. The bank regulators had to approve the practice for the thrifts to be able to use this practice for such purposes.

tarily for the purpose of making money, a legitimate purpose, but not one the public must underwrite. It turned out for *some* that the bargains they struck were disastrous. That was due to their management's bad judgment, coupled with their decision to use the optional accounting practices.

I see no reason for reprinting my prior lengthy opinion to make minor editorial changes, *e.g.*, change "we" to "I" throughout. While vacated as a court decision, it remains in the books for anyone to read who may be interested. I will simply incorporate it here by reference.

LOURIE, *Circuit Judge*, dissenting.

I respectfully dissent.

I have no quarrel with the majority's conclusion that the government had a contractual obligation to permit the thrifts to count supervisory goodwill as regulatory capital and to accept the particular amortization periods. Moreover, there can be little doubt concerning the essential unfairness in Congress's denial of those contractual rights in its enactment of FIRREA.

However, I believe that the sovereign acts doctrine is a barrier to the thrifts' recovery under a breach of contract theory. In *Horowitz v. United States*, the Supreme Court held that "the United States when sued as a contractor cannot be held liable for an obstruction to the performance of [a] particular contract resulting from its public and general acts as a sovereign." *Horowitz v. United States*, 267 U.S. 458, 461, 45 S.Ct. 344, 69 L.Ed. 736 (1925). An embargo placed by the Railroad Administration on shipments of silk by freight did not obligate the government for breach of its contract to ship silk which the Ordnance Department had sold to the petitioner. This case is no different in principle.

The majority holds that the enactment of certain sections of FIRREA was not a "public and general" act because "legislation whose principal effect is to abrogate specific contractual rights does not immunize the government from contractual liability under the doctrine." In support of this principle, the majority cites *Everett Plywood Corp. v.*

*United States*, 651 F.2d 723, 731–32, 227 Ct.Cl. 415 (1981) and *Sun Oil Co. v. United States*, 572 F.2d 786, 817, 215 Ct.Cl. 716 (1978). The majority also quotes the Court of Federal Claims' decision in *Winstar II* stating that the government is not afforded immunity when it "acts not in its capacity as sovereign, but in its capacity as contractor." *Winstar Corp. v. U.S.*, 25 Cl.Ct. 541, 551 (1992). In addition, the majority refers to *Lynch v. United States*, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934), and *Perry v. United States*, 294 U.S. 330, 55 S.Ct. 432, 79 L.Ed. 912 (1935).

Neither *Everett* nor *Sun Oil*, however, involved an act of general legislation as the asserted ground of contract breach. *Everett* dealt with an agency's termination of a single logging contract. The *Everett* court specifically stated that "[i]t would have been an entirely different case if Congress had passed a law immediately prohibiting all cutting in public forests." *Everett*, 651 F.2d at 732. Similarly, in *Sun Oil* the Secretary of the Interior denied a single drilling permit; there was no question of an alleged breach by legislation. In both *Everett* and *Sun Oil* the agency action was directed to a single contract, not all government contracts having a particular provision. Furthermore, unlike the legislation at issue in *Lynch* and *Perry*, FIRREA's change in the regulatory treatment of supervisory goodwill did not repudiate a debt of the United States. No authority of which I am aware suggests that a comprehensive piece of national legislation such as FIRREA is not a "public and general" sovereign act of government.

The majority, like the Court of Federal Claims, states that only certain sections of FIRREA are relevant to the issue at hand. Of course, defining the relevant governmental action narrowly focuses on the impact that FIRREA had on the particular parties before us. However, it also mischaracterizes the true nature of the governmental action. Congress did not act only against certain thrifts or contracts; it acted to deal with the entire thrift system in order to save it. Doing so required dealing with the problem of underfunded thrifts to which the treatment of goodwill was integrally related.

Furthermore, I cannot see how Congress was acting in its contractual capacity, rather than in its role as sovereign, when it enacted FIRREA. The government was not buying goods or services when it acted. The legislation was intended to eliminate, nationally, practices that Congress thought were inconsistent with sound banking practice or that otherwise threatened the government's ability to insure the depositors of the thrifts. FIRREA, in fact, reshaped the entire thrift industry on a national level. Thus, one can hardly characterize Congress's act of passing FIRREA as "contractual" rather than sovereign. Moreover, the enactment of FIRREA was public and general; it was broadly directed to the good of the general public, to the country's financial system, rather than to a specific contract that it disapproved.

That some members of Congress argued that enactment of certain provisions of FIRREA would break promises made to the thrifts does not mean that Congress's passage of FIRREA was not a sovereign act; it only states the problem and indicates the understandable distress felt by those members. Nor do such statements overcome the government's sovereign right to enact comprehensive national legislation for the common good without liability for breach of particularly affected contracts. Thus, while the thrifts certainly were victimized when they made commitments in reliance on accounting treatment agreed to by the regulatory agencies, I am unable to conclude that the government was powerless to enact appropriate legislation in order to restructure the U.S. thrift industry.