**FIFTH THIRD BANK OF WESTERN OHIO, Plaintiff,**

and

**Richard J. Miller, Plaintiff-intervenor,**

v.

**The UNITED STATES, Defendant.**

No. 95–503 C.

United States Court of Federal Claims.

April 12, 2002.

Alan M. Grimaldi, Washington, DC, for plaintiff. Robert M. Bruskin, Timothy K. Armstrong, Alexander B. Berger, and Grace Graham, Howrey Simon Arnold & White, LLP, of counsel. Heather L. Thurston, Fifth Third Bank of Western Ohio, Dayton, OH, of counsel.

David A. Levitt and Brian A. Mizoguchi, Jr., Washington, DC, with whom was Acting Assistant Attorney General Stuart E. Schiffer, for defendant. William L. Small, FDIC, of counsel.

Konrad Kircher, Cincinnati, OH, for intervenor.

## OPINION

MILLER, Judge.

This case is before the court after argument on Plaintiff's "Short–Form" Motion for Partial Summary Judgment on Liability and Defendant's Motion for Summary Judgment, both supplemented after assignment to this court. The issue to be decided is whether a contract exists between plaintiff and the United States for the use of particular regulatory accounting methods.

## FACTS

This is a *Winstar* case. *See United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). Fifth Third

Bank of Western Ohio ("plaintiff") is the successor-in-interest to claims originally brought by Citizens Federal Bank, F.S.B. ("Citizens"), in this case.[1] Between 1982 and 1985, plaintiff entered into six transactions with six failing thrifts in southern Ohio. In each transaction plaintiff either acquired branch offices of the failing thrift or merged with the failing thrift. Plaintiff alleges that the Government, through the Federal Home Loan Bank Board ("FHLBB") or specifically the Federal Home Loan Bank of Cincinnati ("FHLB–Cincinatti"), agreed to allow plaintiff to account for each transaction using the purchase method of accounting, designating the excess of the purchase price over the fair market value of identifiable assets as an intangible asset referred to as goodwill; to amortize that goodwill over its estimated useful life; and to count that goodwill towards its regulatory capital requirements.

The six transactions are, as follows:

1. The April 30, 1982 acquisition of 13 branch offices in Cincinnati (the "Southern Division") of Cardinal Federal Savings and Loan Association ("Cardinal");

2. The March 1, 1983 acquisition of the Lebanon and Wilmington branch offices of Gateway Federal Savings and Loan Association ("Gateway");

3. The January 31, 1984 merger with Sentry Savings and Loan Company ("Sentry");

4. The March 1, 1984 merger with Homestead Federal Savings and Loan Association ("Homestead");

5. The August 1, 1985 merger with First Federal Savings and Loan Association ("First"); and

6. The August 5, 1985 acquisition of the Chillicothe branch office of Freedom Federal Savings and Loan Association ("Freedom").

It is undisputed that plaintiff and the Government did not execute a formal agreement regarding these transactions. Instead, plaintiff maintains that an express or implied-in-

---

1. Citizens merged into plaintiff on August 14, 1998. This opinion refers to "Citizens" and "plaintiff" interchangeably.

fact contract can be found among the communications between plaintiff and the Government, internal government communications, and the conduct of the parties.

The parties do not dispute that the communications between plaintiff and the Government with regard to each transaction conform to the following pattern:

1. Plaintiff entered into a formal merger or acquisition agreement with the troubled thrift (to which the Government was not a party). Each agreement was expressly conditioned upon obtaining approval of the agreement by FHLBB. These conditions, however, did not address specific accounting methods.

2. Plaintiff submitted to FHLB–Cincinnati an application for approval of the agreement with the troubled thrift. Each application contained [2]

   A. a copy of the agreement,

   B. a letter from plaintiff's independent accountant concluding that use of the purchase method to account for the transaction was justified under Generally Accepted Accounting Principles ("GAAP") [3]; and

   C. a financial statements anticipating and estimating goodwill.[4]

3. FHLB–Cincinnati approved the agreement by resolution. The resolutions

---

**2.** Plaintiff generally has submitted individual documents that it represents were part of its applications. With few exceptions the documents themselves do not indicate that they were submitted to FHLB–Cincinnati, whether as part of plaintiff's applications or otherwise. Defendant, however, did not challenge or rebut the affidavit supporting these documents, and, when asked at oral argument whether the Government would agree to the contents of the applications, defense counsel equivocated. *See* Transcript of Proceedings, *Fifth Third Bank of Western Ohio v. United States*, No. 95–503C, at 88–89 (Fed.Cl. Mar. 7, 2002).

**3.** Plaintiff did not submit an accountant's letter with the Gateway application. Although the Sentry application did not contain an accountant's letter, on December 5, 1983 plaintiff submitted a November 23, 1983 letter from its independent accountant concluding that the use of the purchase method of accounting was appropriate under GAAP.

The application for approval of the Homestead transaction was submitted pursuant to regulations that indicated that the pooling method of accounting would be used. On February 23, 1984, plaintiff submitted notification that its accountant had approved the purchase method of accounting as consistent with GAAP and that plaintiff sought to amend its application to substitute the purchase method for the pooling method as the preferred method to account for the transaction. According to plaintiff, the notice included a February 20, 1984 letter from its independent accountant, concluding that the use of the purchase method was justified under GAAP, and a Pro Forma Consolidated Statement of Condition as of December 31, 1983, indicating that estimated supervisory goodwill would be acquired in the merger. The February 20 letter does not identify a specific amount of goodwill or a specific amortization period, but refers to a February 16, 1984 letter from plaintiff to the accountant, which states: "The identifiable and

unidentifiable intangible assets arising from this business combination will be amortized in accordance with paragraphs 4–12 of FAS 72." The February 16 letter does not describe or refer to a specific amount of goodwill or a specific amortization period. FHLB–Cincinnati permitted the amendment to the Homestead application on the ground that the purchase method of accounting was appropriate for the transaction under GAAP. In a February 23, 1984 internal memorandum, FHLB–Cincinnati acknowledged that plaintiff's use of the purchase method would result in goodwill of approximately $22,100.00.

**4.** For the Cardinal application, plaintiff submitted a Pro Forma Consolidated Statement of Condition as of March 31, 1982, recording estimated supervisory goodwill anticipated in the transaction at $38,146,000.00. For the Gateway application, plaintiff submitted a Pro Forma Consolidated Statement of Condition as of December 31, 1982, as well as a Summary of Merger, estimating supervisory goodwill anticipated in the transaction at $7,920,000.00. For the Sentry transaction, plaintiff submitted a business plan and a Pro Forma Consolidated Statement of Condition as of June 30, 1983, stating that the purchase method of accounting would be used and would yield estimated supervisory goodwill in the amount of $20,178,000.00, to be amortized over 20 years. As discussed *supra* note 3, plaintiff's amended Homestead application included a Pro Forma Consolidated Statement of Condition as of December 31, 1983, anticipating an estimated $35,777,000.00 in supervisory goodwill. For the First application, plaintiff submitted a Pro Forma Statement of Condition as of December 31, 1984, recording estimated supervisory goodwill anticipated in the transaction at $5,118,000.00 and predicting a 20–year amortization period. Finally, for the Freedom application, plaintiff submitted a Pro Forma Statement of Condition as of March 31, 1985, estimating supervisory goodwill anticipated in the transaction at $805,000.00 and predicting a 10–year amortization period.

required that prior to consummation of the acquisition, plaintiff provide an opinion letter from its independent accountant justifying the use of the purchase method of accounting, describing any goodwill arising from the purchase, and substantiating the reasonableness and amounts of the goodwill and its amortization period. The resolutions also required that, within 30 days of the effective date of the transaction, plaintiff submit (1) an opinion from local counsel stating the effective date of the acquisition, (2) financial statements for plaintiff and the other thrift as of the effective date, and (3) a letter from plaintiff and the other thrift stating that no adverse change had occurred in the condition or operation of either institution.[5]

4. Plaintiff submitted the compliance materials, which stated that the transaction was completed consistent with the pro forma statement of condition contained in the application. Particularly, plaintiff submitted the financial statements and accountant's letter required by each resolution.[6]

5. In its demand for an accountant's letter, the resolution approving the Cardinal agreement specifically referred to a 30–year amortization period. The resolutions approving the First and Freedom agreements demanded that the accountant's letter also specifically identify any intangible assets and the basis for estimating their useful life.

6. As with the application documents, plaintiff has submitted letters from the accountant to plaintiff that it represents were submitted to FHLB–Cincinnati. For some transactions plaintiff has submitted a separate letter from plaintiff to FHLB–Cincinnati purporting to enclose the letters. Defendant, however, did not challenge or rebut the affidavit supporting these documents.

In response to the Cardinal resolution, plaintiff submitted an opinion letter from its independent accountant, dated May 27, 1982, concluding that the use of the purchase method of accounting was appropriate. The letter then lists, under the heading "Tangible and Intangible Assets," an entry "Goodwill, if any" and a corresponding entry under the heading "Amortization Period (Straight-line Method)," the notation "40 years." The letter continues:

> Any portion of the purchase price not assigned to specifically identified assets will be goodwill. [W]e feel that the amount attributable to goodwill, if any, will be minimal.... Any goodwill arising from this transaction would have an indefinite life; therefore, amortizing goodwill over 40 years would appear reasonable.

Plaintiff also submitted Statements of Condition for itself and Cardinal as of April 30, 1982, the effective date of the transaction, identifying $38,144,833.80 as supervisory goodwill generated by the transaction.

In response to the Gateway resolution, on June 2, 1983, plaintiff submitted a May 23, 1983 letter from plaintiff's independent accountant concluding that the use of the purchase method of accounting was appropriate under GAAP. The letter then lists, under the heading "Tangible and Intangible Assets," an entry "Goodwill, if any" and a corresponding entry, under the heading "Amortization Period," the notation "10 years—interest method." The letter explains:

> Any portion of the purchase price not assigned to specifically identified assets will be goodwill. [W]e feel that the amount attributable to goodwill, if any, will be minimal.... Any excess in the fair value of liabilities assumed over the fair value of tangible and identified intangible assets acquired (goodwill) arising from this transaction will be amortized over the estimated remaining life of the long-term interest-bearing assets acquired in accordance with Statement of Financial Accounting Standards No. 72.

Plaintiff also submitted a Statement of Condition for itself as of March 1, 1983, the effective date of the transaction, identifying $8,122,000.00 as supervisory goodwill generated by the transaction and a separate statement of entries to reflect the transaction that identified $8,121,962.64 as supervisory goodwill.

In response to the Sentry resolution, by letter of March 7, 1984, plaintiff directed FHLB–Cincinnati's attention to the November 23, 1983 letter from its independent accountant—submitted after its application—concluding that the use of the purchase method of accounting was appropriate under GAAP. The March 7 letter states that "[g]oodwill arising from the purchase ... has been described and estimated as to amount in the Application for Merger" and "[t]he related (goodwill) amortization period and method will be as described in the Application." Plaintiff also submitted a Statement of Condition for itself as of January 31, 1984, the effective date of the transaction, identifying $20,645,000.00 as supervisory goodwill generated by the transaction.

In response to the Homestead resolution, plaintiff appears to allege either that on March 15, 1984, it submitted a letter from plaintiff's independent accountant justifying the use of the purchase method of accounting, or that it was already in compliance with the resolution because plaintiff had submitted the February 20, 1984 letter with its amended application. The record is not clear on this point. *Compare* Pl.'s Br. filed Apr. 2, 1998, at 13, *with* letter of March 15, 1984. Although the February 20 letter concludes that the use of the purchase method of accounting was appropriate under GAAP, that

5. FHLB–Cincinnati confirmed by letter that plaintiff had complied with the conditions of the resolution approving the transaction.

In addition to these communications, FHLB–Cincinnati conducted an in-depth evaluation of the proposed transactions, conditionally approving them prior to the official approval embodied in the resolutions. These conditional approvals and evaluations were memorialized in internal FHLB–Cincinnati "digests" and recognized plaintiff's expectation to account for the transactions using the purchase method, to amortize goodwill, and to count that goodwill towards regulatory capital.[7] They were not communicated to plaintiff.

Finally, it is undisputed that plaintiff actually accounted for each transaction using the purchase method, amortizing the goodwill and counting this goodwill towards its regulatory capital requirements.[8]

The parties dispute the extent to which FHLB–Cincinnati was involved in negotia-

---

letter does not identify a specific amount of goodwill or a specific amortization period, but refers to a February 16, 1984 letter from plaintiff to the accountant, which states: "The identifiable and unidentifiable intangible assets arising from this business combination will be amortized in accordance with ... FAS 72." The February 16 letter does not describe or reference a specific amount of goodwill or a specific amortization period. It is not clear whether the Pro Forma Consolidated Statement of Condition as of December 31, 1983, submitted with plaintiff's request to amend its application for approval, was attached or otherwise related to the February 20 letter.

In response to the First resolution, plaintiff submitted an August 26, 1985 letter from plaintiff's independent accountant stating that the use of the purchase method of accounting was justified under GAAP. The August 26 letter does not identify a specific amount of goodwill or a specific amortization period, but refers to a May 1, 1985 letter by plaintiff to the accountant, which states: "The identifiable and unidentifiable intangible assets arising from this business combination will be amortized in accordance with [FAS 72]." The May 1, 1985 letter does not describe or refer to a specific amount of goodwill or a specific amortization period. Plaintiff also submitted a Statement of Condition for itself as of August 1, 1985, the effective date of the transaction, identifying $6,989,405.00 as supervisory goodwill generated by the transaction.

Finally, in response to the Freedom resolution, plaintiff submitted an August 26, 1985 letter from plaintiff's independent accountant stating that the use of the purchase method of accounting was justified under GAAP. An attachment to the August 26 letter indicates that liabilities assumed will exceed assets acquired in the amount of $800,224.00 and that this amount, referred to as goodwill, will be amortized on the straight-line basis over a 10–year period. Plaintiff also submitted a Statement of Condition for itself as of August 5, 1985, the effective date of the transaction, identifying $800,224.00 as supervisory goodwill generated by the transaction.

7. The digest for the Cardinal transaction refers to the pro forma submitted in plaintiff's application and states: "Goodwill of approximately $35,000,000 will result from the transaction and will be amortized over 30 years." The digest for the Gateway transaction states: "Citizens will recognize goodwill of approximately $7,920,000.00." The digest for the Sentry transaction purports to attach plaintiff's Pro Forma Consolidated Statement of Condition as of June 30, 1983, stating that the purchase method of accounting would be used and would yield estimated supervisory goodwill in the amount of $20,178,000.00 to be amortized over 20 years. The digest for the Freedom transaction states: "The application indicates the core deposit premium will be amortized by the straight line method over a ten-year period as goodwill. The amount of goodwill is approximately $805,000." The digest for the Homestead transaction reflects the pooling method of accounting called for in plaintiff's original application. In a February 23, 1984 internal memorandum, however, FHLB–Cincinnati acknowledged that plaintiff's use of the purchase method would result in goodwill of approximately $22,100.00. Plaintiff did not submit a digest for the First transaction.

Plaintiff demonstrated at oral argument that the digest for the Cardinal transaction treats goodwill as a capital asset in projecting plaintiff's net worth after the transaction. Defendant did not dispute this matter, nor did it question whether the digests for Gateway, Sentry, and Freedom also treat goodwill in this manner.

8. As a result of the acquisition of the Southern Division, plaintiff recorded $36,926,433.80 in supervisory goodwill, amortized on a schedule of approximately 30 years. As a result of the Gateway Acquisition, Citizens recorded $9,685,667.64 in supervisory goodwill, amortized on a schedule of approximately 10 years. As a result of the Sentry merger, plaintiff recorded $13,779,937.00 in goodwill, amortized over approximately 20 years. As a result of the Homestead merger, plaintiff recorded $36,371,076.36 in supervisory goodwill, amortized on a schedule of approximately 30 years. As a result of the First Federal merger, plaintiff recorded $3,423,789.43 in supervisory goodwill, amortized on a schedule of approximately 20 years. As a result of the Freedom acquisition, plaintiff recorded $800,224.32 in supervisory goodwill, amortized on a schedule of approximately 10 years.

tions between plaintiff and the troubled thrift. The parties also dispute the extent of any communications in addition to those discussed above, particularly the extent of informal conversations and meetings between employees and officers of plaintiff and officials of FHLB–Cincinnati. The parties also dispute the economic circumstances surrounding each transaction, including the motivations of plaintiff and the Government.

## DISCUSSION

### 1. Summary judgment

Summary judgment is proper when no genuine issues of material fact are in dispute and the moving party is entitled to judgment as a matter of law. See RCFC 56(c). Genuine disputes over material facts that may significantly affect the outcome of the matter preclude an entry of judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the burden of demonstrating the absence of genuine issues of material facts. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

During oral argument the parties commendably identified with precision the above disputed and undisputed facts. With regard to the disputed facts, each party satisfied its burden of presenting sufficient evidence upon which the trier of fact reasonably could find

in its favor. See Celotex, 477 U.S. at 322–24, 106 S.Ct. 2548; Anderson, 477 U.S. at 250, 106 S.Ct. 2505. In particular, any dispute regarding additional communications between plaintiff and the Government necessarily requires credibility determinations and the weighing of evidence and is especially inappropriate for resolution on summary judgment. See Anderson, 477 U.S. at 255, 106 S.Ct. 2505; Jay v. Secretary of DHHS, 998 F.2d 979, 982 (Fed.Cir.1993). The question before the court consequently is limited to whether the undisputed facts identified above warrant or preclude judgment as a matter of law.

### 2. Government as regulator and contractor

■■■ The general requirements for a binding contract with the United States are identical for both express and implied contracts. Trauma Serv. Group v. United States, 104 F.3d 1321, 1325 (Fed.Cir.1997). To establish a contract with the Government, plaintiff must show (1) mutuality of intent to contract; (2) consideration; (3) lack of ambiguity in offer and acceptance; and (4) actual authority of the Government representative whose conduct is relied upon to bind the Government in contract. Lewis v. United States, 70 F.3d 597, 600 (Fed.Cir.1995). The primary question before the court concerns the first element.[9] Mutuality of intent to

9. Defendant appears to have abandoned an earlier challenge to the authority of FHLB–Cincinnati to make promises regarding regulatory accounting. It is clear that FHLB–Cincinnati had authority to approve transactions in which goodwill would be included in assets in order to satisfy regulatory capital. Delegation of Authority Regarding Merger Approvals, 47 Fed.Reg. 8152 (1982). While the court is not aware of any express contractual authority similar to that relied on by Winstar, 518 U.S. at 890–91, 116 S.Ct. 2432 (citing 12 U.S.C. § 1729(f) (1989)), the Federal Circuit emphatically ruled on this issue in Cal. Fed. Bank, FSB v. United States ("CalFed"), 245 F.3d 1342, 1347 (Fed.Cir.2001). See also CalFed, 39 Fed.Cl. 753, 776–77 (1997).

Defendant also suggested that the transactions provided little, if any, consideration for the Government because whatever financial stability was obtained for the failing thrift was offset by a reduction in plaintiff's net worth. Def.'s Br. filed Jan 16, 2001, at 22–24. The court does not consider this an argument concerning consideration. The economic circumstances surrounding

the transactions are probative of the Government's intent because they tend to indicate that the Government promised certain regulatory accounting treatment to avoid insurance liability. Winstar, 518 U.S. at 863–64, 116 S.Ct. 2432. If such a bargain is established, the fact that the Government miscalculated the benefit of these transactions does not amount to a failure of consideration. Mills v. United States, 187 Ct.Cl. 696, 700–01, 410 F.2d 1255, 1258 (1969) (court will not inquire into mere adequacy of consideration); cf. Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1382 (Fed.Cir.2001) (reasoning that Government intended to receive time in exchange for its promise).

Defendant has also challenged the existence of authority and the sufficiency of consideration with regard to the Sentry transaction. Unlike the other five transactions, Sentry was not insured by the Federal Savings and Loan Insurance Corporation ("FSLIC"). Because the parties have not had the opportunity to brief the Court of Federal Claims' recent decision on this issue in Home Sav. of Amer., F.S.B. v. United

contract requires a manifestation of the Government's assent to the agreement—that is, a promise by the Government "to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." RESTATEMENT (SECOND) OF CONTRACTS § 2(1) (1981). A promise may be express or implied, but is to be distinguished from mere statements of intention, opinion, or prediction. *E.g., Cutler–Hammer, Inc. v. United States,* 194 Ct.Cl. 788, 794, 441 F.2d 1179, 1182–83 (1971) ("In general, the obligation of the Government, if it is to be held liable, must be stated in the form of an undertaking, not as a mere prediction or statement of opinion or intention.").

The irreducible question in this case, as in each *Winstar* case, is whether the Government made a binding promise to provide certain regulatory treatment for the six transactions at bar. *See Winstar,* 518 U.S. at 868–69, 116 S.Ct. 2432, *passim* (discussing promissory nature of Government's conduct and expressions); *CalFed,* 245 F.3d at 1349 (same). *Winstar* further clarified the scope of this inquiry in two respects. First, the court need not look for a specific promise to insure against a change in regulatory policy; it is enough that the Government promises to accord certain regulatory treatment for a certain period of time. Second, the court determines whether a promise has been made by application of ordinary principles of the common law of contracts.[10]

■ In its sovereign capacity as regulator, the Government routinely applies and enforces standards to which private entities must conform their activities. Private parties often are required to obtain the approval of an administrative agency for a given course of conduct spanning a given period of time. The regulatory act of approval is ordinarily a statement that the conduct conforms with existing law or policy and no more. Absent some evidence of contractual intent, no promise can be found, whether it be a promise to continue to regulate in a certain manner for a certain period of time, a promise to insure against a change in the law, or otherwise. *E.g., Winstar,* 518 U.S. at 913, 918, 116 S.Ct. 2432 (Breyer, J., concurring); *Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.,* 470 U.S. 451, 465–67, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985); *New Era Constr. v. United States,* 890 F.2d 1152, 1154–55 (Fed.Cir.1989); *Aetna Cas. & Surety Co. v. United States,* 228 Ct.Cl. 146, 152–54, 655 F.2d 1047, 1052–53 (1981); *Floyd v. United States,* 26 Cl.Ct. 889, 891 (1992), *aff'd,* 996 F.2d 1237 (Fed.Cir. 1993) (unpublished table decision).

That being said, the Government can and does make promises regarding its regulatory function. In *Winstar* the Federal Circuit and the Supreme Court determined that

---

*States,* 50 Fed.Cl. 427 (2001), the court will defer judgment on this issue. Likewise, the court defers ruling on defendant's argument that the Sentry claim is barred by the statute of limitations until the parties have briefed this issue as well.

**10.** Both of these qualifications emerge from discussion of the unmistakablity doctrine in the original *Winstar* case. A plurality of four justices concluded that the unmistakability doctrine did not apply and that "normal" contract law governed instead. *Winstar,* 518 U.S. at 880, 116 S.Ct. 2432. They held that the promise to regulate a certain way is a promise to bear the risk of a change in the regulations: "We read this promise as the law of contracts has always treated promises to provide something beyond the promisor's absolute control, that is, as a promise to insure the promisee against loss arising from the promised condition's nonoccurrence." *Id.* at 868–69, 116 S.Ct. 2432.

Justice Scalia, joined by Justices Kennedy and Thomas, concluded that the unmistakability doctrine applied, but reasoned that "the doctrine has little if any independent legal force beyond what would be dictated by normal principles of contract interpretation. It is simply a rule of presumed (or implied-in-fact) intent." *Id.* at 920, 116 S.Ct. 2432. Justice Scalia explained that, while it is reasonable to construe a contract to prohibit the promisor from doing anything to frustrate or impede the parties' performance, this canon does not hold true for the Government: "To the contrary, it is reasonable to presume (*unless the opposite clearly appears* ) that the sovereign does *not* promise that none of its multifarious sovereign acts, needful for the public good, will incidentally disable it or the other party from performing one of the promised acts." *Id.* at 920–21, 116 S.Ct. 2432. According to Justice Scalia, this presumption was overcome by the Government's promise to regulate the *Winstar* plaintiff in a certain way, for a certain period of time. *Id.* at 921, 116 S.Ct. 2432.

binding promises had been made regarding the use of the purchase method of accounting, the amortization of goodwill, and the inclusion of goodwill in regulatory capital. The "inescapable conclusion" reached by the Supreme Court plurality in *Winstar* was that "the Government's 'regulatory' and 'nonregulatory' capacities were fused in the instances under consideration." 518 U.S. at 894, 116 S.Ct. 2432. By entering into the supervisory merger agreements in that case, the Government sought to protect the insurance fund maintained by Federal Savings and Loan Insurance Corporation ("FSLIC"). The plurality reasoned that the Government was therefore acting "in its capacity analogous to a private insurer" and likened the merger agreements to "private contracts for reinsurance." *Id. Winstar* did not suggest that this observation, standing alone, compelled a conclusion that the Government's conduct was contractual. Instead, the Federal Circuit and the Supreme Court carefully reviewed "the Bank Board resolutions, Forbearance Letters, and other documents setting forth the accounting treatment to be accorded," and determined that they were not "mere statements of then-current regulatory policy, but in each instance were terms in an allocation of risk of regulatory change that was essential to the contract between the parties." *Id.*

### 3. *Winstar precedent*

■ As the above discussion makes clear, the six transactions at bar do not exist in a vacuum, but must be viewed in the context of prior decisions, particularly *Winstar* and *CalFed,* which delimit the universe of binding precedent in these cases. In each case the Federal Circuit concluded that a binding promise had been made to accord particular regulatory treatment to the transactions at issue. In each case the court conducted a thorough examination of the record, including documents generated during the process of obtaining regulatory approval of the transaction, negotiations between the parties, and surrounding economic circumstances.

The Glendale [11] transaction most closely resembles this case. Like the record for the Glendale transaction, the instant record does not contain an explicit communication from FHLBB to plaintiff regarding the use of the purchase method to account for the transaction, the amortization of goodwill, or the inclusion of goodwill in computing regulatory capital requirements. In other words, the facts of the Glendale transaction do not disclose a comprehensive, precise promise by the Government to provide the regulatory treatment.[12]

Rather, the communications in Glendale roughly track the pattern followed in this case. Glendale Federal Bank, FSB, entered into a merger agreement with a failing thrift that was "expressly conditioned on FSLIC's approval of the merger and its assent to allowing Glendale to use the purchase method of accounting." *Statesman,* 26 Cl.Ct. at 909. Glendale submitted a proposal to FHLBB to obtain approval of the merger agreement. *Winstar,* 64 F.3d at 1536. The proposal assumed the use of the purchase method of accounting to record supervisory goodwill resulting from the transaction as an

---

**11.** After issuing a decision on liability, *Winstar Corp. v. United States,* No. 90–8C, *Statesman Sav. Holding Corp. v. United States,* No. 90–773C, and *Glendale Federal Bank, FSB v. United States,* No. 772C, were consolidated for appeal under the style *Winstar Corp. v. United States. See Statesman Sav. Holding Corp. v. United States,* 26 Cl.Ct. 904, 924 (1992).

**12.** The record for two of the three transactions at issue in *Winstar* included such a communication. With regard to the Winstar transaction, a forbearance letter from FHLBB to the plaintiff "stated that intangible assets resulting from use of the purchase method of accounting 'may be amortized ... over a period not to exceed 35 years by the straight-line method.'" *Winstar Corp. v. United States,* 64 F.3d 1531, 1538 (Fed.

Cir.1995). With regard to the Statesman transaction, the FHLBB resolution approving the transaction "expressly approved and described the accounting treatments to be used in the Statesman merger transaction." *Id.* at 1543. Likewise, in *CalFed* the record for the Brentwood Savings and Loan Association transaction revealed that FHLBB "issued a forbearance letter stipulating that the resulting association may amortize any goodwill created over 35 years." 245 F.3d at 1345. Similarly, FHLBB issued a forbearance letter confirming CalFed's entitlement to record the Family Savings and Loan Association transaction "under the purchase method of accounting and amortize resulting goodwill over 40 years." *Id.*

intangible asset amortizable over periods up to 40 years. *Id.; see also Winstar,* 518 U.S. at 861, 116 S.Ct. 2432.

FSLIC and Glendale entered into a written contract—a Supervisory Action Agreement, or "SAA"—under which FSLIC provided assistance to facilitate the transaction. *Winstar,* 64 F.3d at 1537; *Statesman,* 26 Cl.Ct. at 909. The SAA, in turn, contained an integration clause that incorporated the contemporaneous resolutions and letters issued by FHLBB and FSLIC. *Winstar,* 64 F.3d at 1540.

FHLBB passed a resolution approving the Glendale transaction. *Id.* The resolution contained two pertinent provisions. First, as with plaintiff's transactions, FHLBB required the submission of an accountant's letter justifying the use of the purchase method under GAAP, specifically describing any goodwill, and substantiating the reasonableness of amounts attributed to goodwill and the resulting amortization periods. *Id.* Additionally, the resolution required Glendale to "submit a stipulation that any goodwill arising from this transaction shall be determined and amortized in accordance with [Bank Board] Memorandum R–31b." *Id.* at 1540–41. Memorandum R–31b (1981) constituted FHLBB's guidelines on how an acquiring thrift could count the excess of the acquired thrift's purchase price over the acquired thrift's fair market value as an intangible asset under the purchase method of accounting. *Id.* at 1541.

The Federal Circuit emphasized the importance of the resolution:

> Thus, in Resolution 81–710, the Bank Board clearly evidenced its approval of the terms of the merger, including the terms that the purchase method of accounting would be employed in accounting for the merger, that goodwill arising from the merger would be recorded on Glendale's books, and that such goodwill would be amortized for reasonable periods under reasonable methods, provided these accounting treatments were justified to the satisfaction of the Bank Board's supervisory agent.

*Id.* According to the Federal Circuit, then, the resolution expressly manifested the Government's intent to be bound.

The Federal Circuit also emphasized the fact that, after the merger, Glendale submitted the required letter from its independent accountants. "The letter confirmed as of the date of closing the amount of goodwill resulting from the merger under the purchase method of accounting and reiterated the amortization periods and the amounts of goodwill to be amortized under each period." *Id.* The letter further opined that the accounting methods were in accordance with GAAP as well as Memorandum R–31b. *Id.* FHLBB considered Glendale's submissions to be satisfactory under the Glendale resolution. *Id.*

The Federal Circuit's opinion explicitly stated that its conclusion was based on "the contemporaneous documents, which under the integration clause of the SAA collectively constituted the 'Agreement' of the parties." *Id.* The court concluded that FHLBB and FSLIC "were contractually bound to recognize the supervisory goodwill and the amortization periods *reflected in the approved accountants' letter.*" *Id.* at 1541–42 (emphasis added).

The appellate court noted, as additional evidence of the Government's intent, an internal FHLBB letter from the Director of FSLIC to FHLBB recommending the use of the purchase method of accounting for the merger and explicitly referring to a second letter setting forth the specific amount of supervisory goodwill projected to be amortized. *Id.* at 1541. This letter, however, was not incorporated into the SAA and therefore was not essential to the Federal Circuit's conclusion. The Federal Circuit stated that its conclusion was also supported "by other evidence and by the circumstances surrounding the transaction." *Id.* at 1542. Specifically, the court noted the parties' intent to use supervisory goodwill for regulatory capital purposes was evidenced by "the extensive negotiations and the conditions regarding its use." *Id.; see also id.* at 1540 (indicating that Glendale negotiated use of supervisory goodwill with FSLIC prior to obtaining FSLIC's recommendation).

According to the court, had supervisory goodwill not been counted toward regulatory capital requirements, "the merged thrift would have been subject to regulatory non-compliance and penalties from the moment of its creation." *Id.* at 1542 ("[N]o healthy thrift would consummate a transaction that immediately put it in regulatory noncompliance."). The Federal Circuit found this circumstance important despite the fact that Glendale also had obtained a letter in which FHLBB pledged to forbear from exercising its authority to bring enforcement proceedings against Glendale for failing to satisfy regulatory capital requirements following the merger. *Statesman,* 26 Cl.Ct. at 910.

Finally, the Federal Circuit noted that FSLIC had indicated in the SAA that the thrift to be acquired was "in danger of default and that the nature and/or amount of such assistance would be less than the losses FSLIC would sustain upon the liquidation of [the thrift]." *Winstar,* 64 F.3d at 1542. The court understood that without the use of supervisory goodwill, the merged thrifts would have been in a failing position, resulting in the losses that FSLIC sought to avoid.

### 4. *Comparison with the six transactions at bar*

The heart of defendant's argument is that the documents before the court, in the context in which they were generated, do not indicate intent by either party to enter into a contract; rather, they reflect a purely regulatory process by which plaintiff sought, and the Government granted, the right to acquire branches of, or merge with, failing thrifts.

Def.'s Br. filed Oct. 10, 2000, at 6. This argument is premised on defendant's bedrock argument that "[a] regulatory approval of a transaction cannot be found to evidence the intention to be bound necessary to form an express or implied-in-fact contract." *Id.* at 26.

The United States made the same argument on the facts in *Winstar.* *See* 518 U.S. at 862, 116 S.Ct. 2432; *Winstar Corp. v. United States,* 994 F.2d 797, 807 (Fed.Cir. 1993), *rev'd en banc,* 64 F.3d 1531 (Fed.Cir. 1995). In *Winstar* the Government did not dispute that the record memorialized the Government's understanding that Glendale would account for the purchase method of accounting and that goodwill would be amortized over a specific period and counted towards regulatory capital. *See Winstar,* 518 U.S. at 862, 116 S.Ct. 2432; *Winstar,* 994 F.2d at 807. With regard to the six transactions at bar, defendant does not contest seriously that plaintiff's applications adequately documented, and FHLB–Cincinnati understood and approved, plaintiff's intention to use the purchase method of accounting to generate goodwill that would be amortized over a given period and included in regulatory capital.[13] Instead, the dispute in this case, as with the Glendale transaction, is whether this understanding was a contractual undertaking, as opposed to a statement of existing regulatory policy. *Winstar,* 518 U.S. at 862, 116 S.Ct. 2432.

Three facts distinguish the transactions at issue in this case from the Glendale transaction.[14]

**13.** Defendant's February 25, 2002 Supplemental Brief does not challenge that these accounting methods were documented adequately in plaintiff's applications and were approved by FHLB–Cincinnati. Defendant's prior briefs make only the faintest suggestion of such a challenge.

**14.** Other differences are not legally significant. For example, unlike the record of the Glendale transaction, none of the agreements with the failing thrifts in this case was conditioned expressly on obtaining approval of particular accounting treatment by regulators. This, however, hardly could have been a controlling fact. What is important for purposes of contract law are the communications between the parties. Here, as with the Glendale transaction, the agreement with the failing thrift was communi-

cated to the Government through an application or proposal for approval of the agreement. It is this broader communication that is important; the agreement between the thrifts was only relevant because it was a part of this communication. The court perceives no difference whether the particulars regarding accounting and regulatory treatment were contained in the agreement or in another part of the application. So long as they were part of this communication to the Government, they form the basis for subsequent communications between the Government and plaintiff.

Similarly, the fact that none of the resolutions in this case references Memorandum R–31b is not significant. As noted above, Memorandum R–31b constituted FHLBB's guidelines on the

### 1) *Absence of a written agreement*

First, defendant argues that *"Winstar*-related transactions will rarely, if ever, be deemed 'contractual' if the documentation does not include integrated written contracts." Def.'s Br. filed Feb. 25, 2002, at 9. The importance of the SAA to the Federal Circuit and Supreme Court decisions in *Winstar* is not explicit. *Compare Winstar*, 518 U.S. at 863, 116 S.Ct. 2432 ("[T]he SAA characterizes the Board's resolutions and letters not as statements of background rules, but as part of the 'agreements and understandings' between the parties."), *and Winstar*, 64 F.3d at 1541 ("We conclude based on all of the contemporaneous documents, which under the integration clause of the SAA collectively constituted the 'Agreement' of the parties, that the Bank Board and the FSLIC were contractually bound . . . ."), *with Winstar*, 518 U.S. at 863, 116 S.Ct. 2432 ("To the extent that the integration clause leaves any ambiguity, the other courts that construed the documents found that the realities of the transaction favored reading those documents as contractual commitments, not mere statements of policy."), *and Winstar*, 64 F.3d at 1541 (stating that FHLBB resolution "clearly evidenced" Government's intent, which was also "manifested" in a letter from FSLIC to FHLBB).

In *CalFed* defendant argued that the absence of an assistance agreement incorporating the FHLBB resolution and forbearance letters precluded a finding that a contract existed, because all that was left were documents generated in the ordinary course of seeking regulatory approval. 245 F.3d at 1346. *CalFed* rejected the *per se* rule advanced by defendant, stating that *Winstar* "did not rely exclusively on the assistance agreements to find a contract; it considered contemporaneous documents and surrounding circumstances that included forbearance letters like those present here." *Id.* The court noted that the assistance agreements in

the *Winstar* transactions were executed because FSLIC itself contributed cash to further the transaction, and their existence did not dispose of the question of the Government's intent. *Id.* at 1346–47.

The Federal Circuit agreed with the conclusion of the Court of Federal Claims:

> "[I]f the factual records of individual cases show intent to contract with the government for specified treatment of goodwill, and documents such as correspondence, memoranda and [FHLBB] resolutions confirm that intent, the absence of an [assistance agreement] or [supervisory action agreement] should be irrelevant to the finding that a contract existed."

*Id.* at 1347 (quoting *CalFed*, 39 Fed.Cl. at 773) (second, third, and fourth alterations in original). The parties have argued considerably over the meaning of this quotation. Defendant argues that the absence of a written agreement remains significant, because where the record only consists of regulatory documents, it does not show intent to contract, thereby failing to satisfy the predicate of the Federal Circuit's prescription. Plaintiff, on the other hand, reads *CalFed* to hold that a written agreement is irrelevant. Pl.'s Br. filed Feb. 25, 2002, at 7. Plaintiff reasons that these agreements were only executed where FSLIC cash contributions were made, and that FHLBB's and FSLIC's national policy of encouraging private acquisition of failing thrifts included—if not favored—acquisitions that used supervisory goodwill as a "cash substitute." *Winstar*, 518 U.S. at 849–50, 116 S.Ct. 2432.

The court understands *CalFed* to stand for the modest proposition that, where the record otherwise reveals intent to contract, further expression of that intent is "irrelevant." *CalFed* is deliberate where *Winstar* was strongly suggestive: "Regulatory" documents can be construed as contractual commitments where the reality of the transaction supports such a construction. However, the

use of the purchase method to account for goodwill generated by thrift acquisitions under GAAP. R–31b simply describes, and does not purport to qualify, then-existing GAAP. The resolutions, however, already required that plaintiff justify, under GAAP, the use of the purchase method of accounting, any goodwill arising from the pur-

chase, and its amortization period. To require a separate letter justifying these accounting practices under R–31b would have been redundant. *See Citizens Fed. Bank, FSB v. United States,* 51 Fed.Cl. 682, 686–87 (2002). Accordingly, the court concludes that the absence of any reference to Memorandum R–31b is of no moment.

burden of proving that the reality of a transaction favors construing such documents as contractual undertakings, as opposed to regulatory statements, remains with plaintiff.

In *CalFed* the Federal Circuit affirmed the Court of Federal Claims' conclusion that the Government had promised certain regulatory accounting treatment despite the absence of a written agreement. In that case, however, CalFed expressly requested and received supervisory forbearances to use the purchase method of accounting and to amortize goodwill over a specific period. *CalFed,* 245 F.3d at 1345. In the six transactions at bar, on the other hand, no independent request was made by plaintiffs, and no explicit promise was made by FHLB–Cincinnati. Instead, plaintiff's request was embedded in its application, which implicitly was approved by the resolution's requirement of an accountant's letter and the submission of the accountant's letter confirming plaintiff's intentions.

Consequently, the absence of a written agreement is neither fatal nor irrelevant to plaintiff's claims. Plaintiff bears the burden of proving the Government's intent. A written agreement incorporating the resolution would indicate strongly that the parties "agreed" to the terms that the resolution approved. The absence of such an agreement does not preclude the existence of a contract,[15] but plaintiff necessarily must adduce other proof of the parties' contractual intent, such as the forbearance letter at issue in *CalFed,* circumstantial evidence, or additional communications between the parties.

## 2) *Circumstantial evidence*

As noted above, the parties dispute the economic circumstances surrounding the six

transactions, as well as the policies motivating the Government's behavior. The existence of these disputes further distinguishes this case from *Winstar* and *CalFed.*

### 1. *Economic circumstances*

The Supreme Court plurality in *Winstar* discussed at length the economic circumstances surrounding the Glendale transaction and concluded that these circumstances supported its construction of the documentary record as contractual commitments. *See Winstar,* 518 U.S. at 863–64, 116 S.Ct. 2432. The plurality suggested that this evidence overcame any ambiguity, in the absence of a written contract, whether these documents were promises or mere statements of policy. *Id.* at 863, 116 S.Ct. 2432. Both the Federal Circuit and the Supreme Court observed that the resulting thrift immediately would have been in noncompliance without the regulatory accounting treatment. *Id.; Winstar,* 64 F.3d at 1542.[16]

The reasoning in *Winstar* does not require that a transaction be "madness" absent the regulatory treatment in order for a promise to be found. *Winstar,* 518 U.S. at 910, 116 S.Ct. 2432; *see CalFed,* 39 Fed.Cl. at 767. Thus, plaintiff need not establish that it would have been in capital noncompliance unless it were able to amortize goodwill and count it toward regulatory capital requirements. The appropriate question is "whether each party would have engaged in the transaction absent the existence of a binding contract—insolvency is not the determinative factor." *CalFed,* 39 Fed.Cl. at 768.

Although not discussed by the Federal Circuit in *CalFed,* Chief Judge Smith's opin-

---

**15.** Indeed, an argument can be made that, if the other documents did not reflect a prior agreement of the parties, it is hard to see why an integration clause would need to except them in the first place. *See* RESTATEMENT (SECOND) OF CONTRACTS § 213 (1981).

**16.** The Federal Circuit regarded this as "other evidence" not essential to its conclusion. However, unlike the Supreme Court's opinion, the Federal Circuit did *not* venture to discuss how it might view the evidence apart from the SAA. *Compare Winstar,* 518 U.S. at 863, 116 S.Ct. 2432 ("To the extent that the integration clause leaves any ambiguity ...."), *with Winstar,* 64 F.3d at 1542. Moreover, it is not clear what

weight the court should give to plaintiff's prospects for regulatory compliance, given that it obtained forbearances from the enforcement of those requirements for a certain number of years. In *CalFed* Chief Judge Smith rejected defendant's argument that net worth forbearances precluded his finding of a contract because, "[h]ad such five year forbearances been sufficient to induce healthy thrifts to acquire failing ones, separate treatment of goodwill would not have been the subject of negotiation and agreement." 39 Fed.Cl. at 770. As discussed in section 3, *infra,* the extent of the negotiation and agreement in this case is in dispute.

ion recognized that "[b]oth the desire to avoid huge financial loss, as well as a valid concern with the danger of insolvency, provided strong supporting evidence for the contractual nature of the promise in the *Winstar* cases as it does in these cases." *Id.* Chief Judge Smith accepted CalFed's argument that it "certainly would not have acquired Family without the goodwill treatment provided under the regulatory accounting rules at the time of the acquisition." *Id.* This court agrees that such evidence is informative of the parties' intent and supports the proposition that plaintiff bargained for and received a promise of such treatment.[17] The court deems this contextual evidence particularly relevant where the only communications between the parties occur during a process of regulatory approval. *See also Home Sav.,* 50 Fed.Cl. at 435 (noting that economic circumstances are not substitute for actual promise, but, rather, assist in resolving ambiguity whether FHLBB resolution was contractual commitment). This court is confident that the parties understand the difference between evidence of context—what the parties were aware of at the time—and hindsight—a *post hoc* reinterpretation of events.

Plaintiff has not identified undisputed evidence regarding its intent that supports its characterization of the documentary record. In response to defendant's arguments, plaintiff instead attributes the following quotation to *Winstar*: "[I]t would have been irrational [for a thrift] to stake its very existence upon continuation of current policies without seeking to embody those policies in some sort of contractual commitment." Pl.'s Br. filed Feb. 25, 2002, at 14 (second alteration in original). The Supreme Court in *Winstar* made no such statement. The plurality in *Winstar* concluded that "[a]lthough one can

imagine cases in which the potential gain might induce a party to assume a substantial risk that the gain might be wiped out by a change in the law, it would have been irrational *in this case for Glendale*" to have done so. 518 U.S. at 863, 116 S.Ct. 2432 (emphasis added).

Plaintiff's own evidence confirms the case-by-case factual inquiry that is necessary: Its original proposal to merge with Homestead (and FHLB–Cincinnati's conditional approval) was predicated on the use of the pooling method to account for the transaction. Although plaintiff's request to amend its application indicates a strong preference for the purchase method, it does not reveal a situation where economic circumstances leave but one interpretation of the parties' intent.

### 2. Policy context

Similarly, the parties' arguments regarding FHLBB's national policy of encouraging private acquisition of failing thrifts reveal a genuine dispute as to the Government's intentions regarding the six transactions in issue. Defendant suggests that such a policy does not exist and invites the Court of Federal Claims to ignore *as dicta* Part I of the Supreme Court plurality's opinion, as well as Part II–A of the Federal Circuit's *en banc* majority opinion. On the other hand, plaintiff regards this policy as *res judicata* on the Government's contractual intent in approving transactions involving failing thrifts. Neither party is correct.

This court declines to question the historical accounts of the savings and loan industry compiled by the Federal Circuit and the Supreme Court. That history unquestionably influenced those courts' conclusions that the Government had made promises regarding

---

17. Contrary to plaintiff's suggestion, this court does not read the Federal Circuit's silence on the matter in *CalFed* to hold that "it is utterly unprobative on the issue of contract formation whether the acquiring thrift viewed the acquisition as attractive and hoped to derive benefits from it." Pl.'s Br. filed Feb. 25, 2002, at 13. It is true that the Federal Circuit's opinion did not discuss the economic context of the CalFed transactions. Nevertheless, this hardly amounts to criticism of Chief Judge Smith's analysis of such evidence. Plaintiff itself does not appear to so read *CalFed*, for its brief proceeds to argue that plaintiff

"would not have engaged in the supervisory transactions without binding contracts." *Id.* at 14. Plaintiff cannot have it both ways: It cannot submit circumstantial arguments regarding its intent while denying the Government the same opportunity. That being said, the fact that a thrift might have entered into a given transaction without such a promise does not necessarily mean that a promise was not made. If a promise is otherwise established, the Government is bound regardless of whether it subsequently learns that the promise was unnecessary.

regulatory treatment in order to shift liability from FSLIC to healthy thrifts. Nevertheless, for the same reason that FHLBB preferred to encourage such acquisitions without FSLIC contributions, FHLBB certainly would have accepted such transactions without committing itself to a contract. As the Homestead transaction illustrates, it is quite plausible that a healthy thrift would have acquired a failing thrift without being promised the regulatory accounting treatment offered to the plaintiffs in *Winstar*. *See also Winstar*, 518 U.S. at 863, 116 S.Ct. 2432. It is also possible that a healthy thrift would have acquired a failing thrift without stopping to consider whether certain regulatory accounting policies might change. In other words, it is open to dispute whether plaintiff had "the basic foresight" to understand that "it was clearly prudent to get agreement on the matter." *Winstar*, 518 U.S. at 855, 116 S.Ct. 2432. The fact that the Government may have been willing to encourage a given transaction by promising certain regulatory treatment does not eliminate dispute as to whether it actually made such a promise. The Court of Federal Claims cannot imply a contract as a legal conclusion where no such contract exists as a matter of fact.

Plaintiff must identify actual manifestations of the Government's intent to contract with plaintiff. At this stage, plaintiff has not identified undisputed facts that suggest that FHLBB, to advance its national policy, stepped forward and rendered a promise to plaintiff regarding the treatment of goodwill, rather than approved plaintiff's applications in the ordinary course of its duties. Per *CalFed* these manifestations may occur in documents generated during the regulatory approval process, and they may be found among other communications between the parties. The economic and policy context ultimately may convince the court that these documents represent promises, not statements of policy. Nevertheless, the undisputed documentary record does not itself reveal a contractual intent, and a trial is required to place the facts in the proper context.

### 3. Negotiations

The Federal Circuit in *Winstar* referred to the "extensive" negotiations between Glendale and the Government regarding regulatory accounting. 64 F.3d at 1542; *see also Winstar*, 518 U.S. at 861, 909–10, 116 S.Ct. 2432 (recognizing that "the parties went to considerable lengths in procuring necessary documents and drafting broad integration clauses to incorporate their terms into the contract itself"). To be sure, the Federal Circuit regarded this as "other evidence" supporting its conclusion, but, again, the record in that case included a written agreement with the Government.

As discussed above, *CalFed* held that a written agreement was not essential if plaintiff produced other evidence of contractual intent. *CalFed* upheld summary judgment for plaintiff after repeatedly noting that the record in that case revealed "bargained-for-exchanges." 245 F.3d at 1347; *see also id.* (referring to "extensive negotiations" and stating "the government bargained with CalFed to assume the net liabilities of the acquired thrifts in exchange for favorable regulatory consideration"). Similarly, Chief Judge Smith's opinion finds negotiated contracts on the basis of CalFed's specific requests for "approval from the FHLBB to amortize goodwill created by the acquisition under the purchase method of accounting using the straight line method over the estimated useful life of 35 years," and FHLBB's subsequent forbearance letters stipulating that "[t]he resulting association may amortize any goodwill created under the purchase method of accounting using the straight line method over [ ] 35 years." *CalFed*, 39 Fed. Cl. at 774 n. 22 (alterations in original). In other words, the reality of the transactions was negotiated arms-length contracts, and not approvals in the ordinary course of regulation. *Cf. Anderson v. United States*, 47 Fed.Cl. 438, 443, 445 (2000) ("Plaintiffs have provided ample evidence that, far from being a regulatory rubber stamp, this was an agreement that was negotiated over a long period of time, and which was carefully considered and reviewed by regulators.").

The undisputed facts in this case, however, do not reveal any such bargain, whether within or outside the regulatory process. The parties dispute the extent of discussions between FHLB–Cincinnati and plaintiff.

With regard to the Cardinal transaction, for example, defendant maintains that the Government's only role in the transaction, including the negotiations, concerned its regulatory approval function. Def.'s Proposed Findings filed Oct. 10, 2000, Nos. 29, 45. Plaintiff counters that the Government was involved in the negotiations. Pl.'s Proposed Findings No. 41 filed Apr. 3, 2001. Plaintiff contends that FHLB–Cincinnati contacted plaintiff concerning its possible acquisition of these branches, that FHLB–Cincinnati specifically proposed the sale of the Southern Division to plaintiff, and that plaintiff discussed terms of the Cardinal acquisition with both Cardinal and FHLB–Cincinnati. *Id.* Nos. 29, 36. Plaintiff argues that "the government played a key role in facilitating the negotiations and allowing the transactions to proceed and eventually entered into a contract with Citizens." *Id.* Nos. 43, 45. Plaintiff reasons that the Government "induced" plaintiff to acquire the Southern Division "through, among others, the use of purchase method of accounting, supervisory goodwill, and forbearances." *Id.* No. 23.

Plaintiff correctly states that "[a] contract is formed not when negotiations reach some minimum level, but when offer meets with acceptance in the presence of consideration." Pl.'s Br. filed Apr. 3, 2001, at 5. Yet, whether the Government has manifested an offer or acceptance is precisely the question to be resolved. Negotiations between the parties provide color to otherwise inconclusive manifestations.

The court acknowledges that plaintiff has submitted impressive evidence in the form of deposition testimony of FHLB–Cincinnati's Principal Supervisory Agent and Supervisory Agent, who broadly paint all the acts of FHLB–Cincinnati as both contractual and offering a *quid pro quo*.[18] However, when resolving a motion for summary judgment, the court neither may make credibility determinations nor weigh the evidence and seek to determine the truth of the matter. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505; *Jay,* 998 F.2d at 982. The court must limit its inquiry to whether the undisputed facts in the proposed findings and documentary record establish a contract as a matter of law. Among the other differences discussed above, *Winstar,* and particularly *CalFed,* relied on negotiations between the parties to give a contractual context to the documentary record, but the disputed and undeveloped facts at bar do not allow this court to make the same analysis.

## CONCLUSION

Although other judges have expressed impatience with defendant's reluctance to concede the liability juggernaut, no precedent exists for a finding of liability based on the undisputed facts of this case. These facts do not establish, as a matter of law, that the Government manifested its intent to enter into a binding contract with plaintiff. A trial is necessary to make factual findings regarding all the parties' communications, as well as the particular economic circumstances surrounding the transactions. Summary judgment is designed " 'to secure the just, speedy and inexpensive determination of every action,' " *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting FED. R. CIV. P. 1), but a trial court has the discretion to deny summary judgment if "there is reason to believe that the better course would be to proceed to a full trial." *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. These facts are essential to determine whether the documents that have been submitted are promissory in nature.

In declining to accept plaintiff's arguments as established facts, the court does not suggest that plaintiff's version of facts ultimately will not prevail. The disputed record contains evidence of the Government's contractual intent. The court trusts that defendant carefully will evaluate its case before proceeding to trial to assure that plaintiff should not be put unnecessarily to its proofs on the history and context of the six transactions. To this end, the parties are encouraged to identify additional areas of agreement that might facilitate judgment as a matter of law. Accordingly, based on the foregoing,

---

**18.** Absent from plaintiff's submissions, however, is an explanation of how FHLBB's national policy of promising certain regulatory treatment to induce the acquisition of troubled thrifts came to the attention of plaintiff.

**IT IS ORDERED**, as follows:

1. Plaintiff's "Short–Form" Motion for Partial Summary Judgment on Liability is denied.

2. Defendant's Motion for Summary Judgment is denied.

3. The parties shall submit, by April 19, 2002, a briefing schedule to address whether plaintiff's claim regarding the Sentry transaction is barred by the statute of limitations or otherwise is affected by the reasoning in *Home Sav. v. United States,* 50 Fed.Cl. 427 (2001).

4. A scheduling order will enter after the court rules on the outstanding issues involving Sentry.